UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LEAGUE TO SAVE LAKE TAHOE
and SIERRA CLUB,

     Plaintiffs,

       v.

TAHOE REGIONAL PLANNING
AGENCY,

     Defendant.

_____/

NO. CIV. S-08-2828 LKK/GGH

O R D E R

In October of 2008, the Tahoe Regional Planning Agency ("TRPA") adopted amendments to the Shorezone ordinances governing development in the Lake Tahoe basin.  Plaintiffs League to Save Lake Tahoe and Sierra Club ("League") challenge these amendments as violating the Tahoe Regional Compact.  Pending before the court is the League's motion for a preliminary injunction that would bar issuance of permits for construction or installation of boating facilities.  Defendant TRPA argues that this motion should be denied because the League has failed to show likelihood of irreparable injury, and to a lesser extent, because the balance of

1  hardships favors TRPA.  TRPA has explicitly stated that while it
2  disputes the merits of the League's claims, TRPA chooses not to
3  dispute whether the League has shown a likelihood of success on the
4  merits for purposes of the present motion.  For the reasons
5  explained below, the court grants the League's motion in part,
6  issuing a preliminary injunction narrower than the one requested
7  by the League.[1]

8                          **I. BACKGROUND**[2]

9  **A.    Statutory Framework**

10      The Lake Tahoe Basin occupies roughly 501 square miles,
11  straddling the border between California and Nevada.  In 1980, the
12  two states entered an amended Tahoe Regional Planning Compact
13  governing management of the basin.  94 Statute 3233, Pub. L. No.
14  96-551 (December 19, 1980) ("Compact").  The compact created the
15  Tahoe Regional Planning Agency ("TRPA"), which is an administrative

16

17       [1] This case has been consolidated with a suit brought by the
   Shorezone Property Owners Association, which challenges the
18  amendments from a roughly opposite perspective.  The Shorezone
   Property Owners join in TRPA's opposition to the motion for a
19  preliminary injunction, but have not filed a separate opposition.
       The court has also granted intervenor status to the California
20  State Lands Commission, which has not participated in the present
   motion.
21       Finally, the court notes that Mark Gilmartin, a property
   owner, has indicated an intention to intervene in this case.
22  However, as explained by a separate order, no motion to intervene
   has yet been properly filed.
23
       [2] The following statement of the background of this case is
24  drawn largely from the League's memoranda.  TRPA generally contends
   that the League has mis-stated elements of the facts and laws
25  pertaining to this suit, but as part of TRPA's de facto stipulation
   regarding the League's showing of likelihood of success on the
26  merits, TRPA does not challenge the League's statements here.

                                  2

1    agency under the states of California and Nevada.[3]   TRPA is charged

2    with two "imperative" duties: (1) "to establish environmental

3    threshold carrying capacities" for the Tahoe Region and (2) "to

4    adopt and enforce a regional plan and implementing ordinances which

5    will achieve and maintain such capacities while providing

6    opportunities for orderly growth and development consistent with

7    such capacities."  Compact art. I(b); see also id. at art. V(b),

8    (c).

9        Environmental threshold carrying capacities are environmental

10   standards "necessary to maintain a significant scenic,

11   recreational, educational, scientific or natural value of the

12   region or to maintain public health and safety within the region"

13   and "shall include but not be limited to standards for air quality,

14   water quality, soil conservation, vegetation preservation and

15   noise."  Compact art. II(i).  In accord with this mandate, TRPA has

16   adopted 36 separate threshold standards, including standards for

17   water clarity and quality, air quality, recreational access, and

18   scenic quality.  The League contends that the basin is currently

19   not in attainment for many of these thresholds, and for purposes

20   of this motion, TRPA does not dispute this contention.

21       The thresholds place two limits on TRPA's ability to amend the

22   _____

23       [3] Thus, TRPA is not a federal agency, and is not subject to
     the statutes regulating such agencies, such as the Administrative
24   Procedure Act, 5 U.S.C. § 551 et seq., and the National
     Environmental Policy Act, 42 U.S.C. § 4321 et seq..  Although TRPA
25   is a state agency, it is not shielded by states' sovereign
     immunity.  Lake Country Estates, Inc., 440 U.S. 391, 402 (1979).

26

                                    3

1  Regional Plan and implementing Code of Ordinances.  Amendments must
2  "achieve[] and maintain[] the thresholds."   Code § 6.5.  See also
3  Compact art. V(g) (projects, including amendments, must "not cause
4  the adopted environmental threshold carrying capacities of the
5  region to be exceeded").    Amendments must also avoid adverse
6  environmental impacts where possible.  "[W]hen acting upon matters
7  that have a significant effect on the environment," TRPA must
8  prepare an Environmental Impact Statement ("EIS").  Id. art VII(a).
9  The amendments are such a matter, and TRPA prepared an EIS for
10  them.  For any project for which an EIS is prepared, TRPA cannot
11  approve the project unless "(1) Changes or alterations have been
12  required in or incorporated into such project which avoid or reduce
13  the significant adverse environmental effects to a less significant
14  level; or (2) Specific considerations, such as economic, social or
15  technical, make infeasible the mitigation measures or project
16  alternatives discussed in the environmental impact statement on the
17  project."   Code § 5.8.D.; see also Compact art. VII(d)(1), (2).[4]
18  The Compact's EIS provisions are therefore similar but not
19  identical to the requirements applicable to federal actions under
20  the National Environmental Policy Act.  See Glenbrook Homeowners
21  Ass'n v. Tahoe Reg'l Planning Agency, 425 F.3d 611, 616 (9th Cir.
22  2005).

23  _____

24      [4] The Compact contains essentially identical language, except
    that it provides that it omits the word "than," stating that
25  impacts must be reduced to a "less significant level."  Compact
    art. VII(d)(1), (2).  For purposes of this motion, the court adopts
26  the TRPA's interpretation of the Compact as embodied in the Code.

**B.    Shorezone Amendments**

On October 22, 2008, TRPA's Governing Board adopted the Shorezone Amendments at issue in this case.   The Shorezone Amendments allow an additional 128 private piers, 10 public piers, numerous new mooring buoys,[5] 6 new boat ramps, and 235 boat slips to be constructed or placed within Lake Tahoe's Shorezone, the area in which the land meets the lake.

The EIS prepared for the amendments stated that the projected impacts of this increased development include impaired public access to the Shorezone, degraded scenic views along the shore, and a significant increase in motorized boating, resulting in increased emissions of boat exhaust, including pollutants such as carbon monoxide, nitrogen oxides, particulate matter, and various hydrocarbons.  However, the EIS concluded that the amendments would achieve and maintain thresholds, and that the amendments would not have significant adverse impacts.  These conclusions rested in part on a proposed program to mitigate the air and water quality impacts of more motorized boats on the Lake, called the "Blue Boating Program."

The League raises a number of challenges to the amendments. Pertinent to this motion, the League argues that both construction of new piers and permitting of new buoys (whether in addition to or in place of existing unpermitted buoys) will increase the amount of boating on the lake, and that increased boating will harm the

---

[5] The parties dispute the number of new buoys effectively authorized by the amendments, as explained below.

1   environment.  The League argues that the Blue Boating Program is

2   vaguely described, and that as such, the EIS could not conclude

3   that it would mitigate boating impacts.  The League also argues

4   that the EIS used an improper baseline in evaluating the impacts

5   of future buoys.  The Shorezone Amendments allow a total of 6,316

6   buoys to be placed in the Lake.  Code § 52.4.B.  This number was

7   derived by starting from the total number of buoys existing on the

8   Lake in 2002, 4,454 buoys, as the baseline, and determining that

9   1,862 new buoys should be allowed in addition to the baseline.

10  However, the EIS acknowledged that some unknown portion of the

11  baseline consisted of unauthorized buoys, and TRPA has recently

12  estimated that over 1,200 buoys already existing on the Lake have

13  never been issued a permit by TRPA or a state or federal agency.

14  These unpermitted buoys are subject to removal.  The League argues

15  that EIS should have examined the effects of permitting

16  replacements for existing unauthorized buoy, but that the EIS

17  failed to do so.

18       Notwithstanding the League's objections, the Amendments took

19  effect on December 21, 2008.  TRPA began considering applications

20  for permits for five new piers on May 15, 2009.[6]  TRPA states that

21  it does not anticipate a final decision on these applications until

22  "mid-November or mid-December, 2009."  Declaration of Joanne S.

23  Marchetta Supp. TRPA's Response to Mot. for Prelim. Inj., ¶ 14.

24  _____

25       [6] The amendments permit a total of 128 additional private and
26  10 additional public piers, but TRPA can consider only five
    applications per year.

1  TRPA contends that even if it issues permits for one or more piers
2  at that point, construction will not commence until the permit
3  recipients obtain leases or permits from the California Department
4  of State Lands or the Nevada Division of State Lands, followed by
5  permits under the Clean Water Act from the United States Army Corps
6  of Engineers.    No party has provided evidence or argument
7  concerning how long these later processes will take.   Once these
8  other government entities have approved the project, construction
9  can begin immediately.[7]

10      As to buoys, the amended ordinances prohibit TRPA from
11  authorizing additional buoys--i.e., buoys that would bring the
12  total number of buoys above 4,454--until the Blue Boating Program
13  is complete and is demonstrated to be effective.  Code § 52.4.F(1).
14  TRPA states that it does not anticipate that this will occur until
15  summer of 2011, such that no additional buoys will be installed
16  until that time, and the League does not dispute these contentions.
17  However, TRPA need not wait until successful implementation of the
18  Blue Boating Program to authorize buoys to replace existing buoys
19  are found to be illegal and removed.  Code § 52.4.F(2)(c).  TRPA
20  has established an October 15, 2009 deadline for the registration
21  and permitting of all buoys,  Code § 52.4.F(3), and states that it
22  will not be able to begin identifying illegal buoys prior to this
23  point.   TRPA contends that buoys are therefore unlikely to be

24  ———————————————

25      [7] Although there have been seasonal restrictions on
   construction in some areas, it appears that pending applications
26  are for piers outside of these areas.

7

1   removed prior to the summer of 2010.  This is in part because TRPA
2   does not itself have the authority to remove buoys, and must
3   therefore coordinate removal with other state agencies.   TRPA
4   contends that it is therefore unlikely that replacement buoys will
5   be permitted prior to the summer or fall of 2010.  TRPA, however,
6   has not identified any legal or definite barrier to earlier action.

7       Finally, TRPA may accept applications for new boat lifts,
8   ramps, and slips at any time.  Compare Code §§ 52.5 and
9   54.5.A(2)(g) (no phasing for these structures) with § 52.4.F
10  (phasing buoy permitting).

11      **II. STANDARD FOR A MOTION FOR A PRELIMINARY INJUNCTION**

12      There are four factors that a district court must consider
13  when deciding whether to grant a preliminary injunction.   "A
14  plaintiff seeking a preliminary injunction must establish that he
15  is [1] likely to succeed on the merits, [2] that he is likely to
16  suffer irreparable harm in the absence of preliminary relief, [3]
17  that the balance of equities tips in his favor, and [4] that an
18  injunction is in the public interest." Am. Trucking Ass'ns v. City
19  of Los Angeles, 559 F.3d 1046, 1052 (9th Cir. 2009) (quoting Winter
20  v. Natural Res. Def. Council, 129 S. Ct. 365, 374 (2008)).   In
21  Winter, the Supreme Court raised the bar for establishing
22  irreparable harm from a showing of mere possibility, which had
23  previously applied under the Ninth Circuit's sliding scale
24  approach, to a showing of likelihood of irreparable harm.

25      **III. ANALYSIS**
26      The League asks this court to preliminarily enjoin TRPA from

8

1  applying the shorezone amendments to issue permits for new (defined
2  by the League as not in the lake prior to the effective date of the
3  amendments) piers, buoys, boatlifts, boat ramps, and boat slips.[8]

4  **A.    Success on the Merits**

5  　　　For purposes of this motion TRPA does not dispute that the
6  League has shown a likelihood of success on the merits sufficient
7  to support a preliminary injunction.  Without discussing the merits
8  in detail, the court notes that its independent review indicates
9  that  plaintiffs  have  shown  some  likelihood  of  success.
10 Accordingly, for purposes of this motion, the court assumes that
11 plaintiffs have shown a strong likelihood of success on the merits.
12 No party has waived its ability to dispute the merits in future
13 proceedings.

14 **B.    Likelihood of Injury**

15 　　　Under Winter, even when a strong likelihood of success on the
16 merits has been shown, a plaintiff seeking a preliminary injunction
17 must show a likelihood of irreparable injury as well. In Winter,
18 plaintiffs sought to enjoin the Navy from using sonar in certain
19 circumstances, on the ground that such use of sonar could harm
20 marine mammals.  The Ninth Circuit upheld a preliminary injunction.
21 The Navy challenged two of the injunction's terms on the ground
22 that plaintiffs had not shown that, when the remaining provisions
23 were considered, use of sonar in the circumstances prohibited by

24

25        [8] In its initial motion, the League also sought to void
   permits issued by TRPA under the amended ordinances.  However, the
26 League has since conceded that no such permits have yet been
   issued, and withdraws this aspect of its request.

1   the challenged terms was likely to cause irreparable injury to
2   marine mammals.  The Supreme Court reversed.  The Court held that
3   an injunction could only issue  upon a showing of likelihood of
4   irreparable injury of the type described by the Navy.  129 S.Ct.
5   at 376.  The Court then went on to conclude that in the case before
6   it, even if irreparable injury could be shown, "the public interest
7   and the Navy's interest in effective, realistic training of its
8   sailors" provided sufficient reason to deny a preliminary
9   injunction, a circumstance not applicable here.  Id.

10      While the injury question in Winter was whether sonar harmed
11  marine mammals, in this motion, TRPA does not dispute that boating
12  activity causes irreparable injury to the environment.  Nor does
13  TRPA dispute that construction of new piers and other facilities,
14  and placement of additional buoys in the lake, increases boating
15  activity and therefore environmental injury.  TRPA does argue,
16  however, that replacement (c.f. additional) buoys do not cause any
17  injury.  TRPA's primary arguments are that installation of further
18  facilities is not likely to occur prior to final resolution of this
19  suit and that issuing permits will not itself cause injury.

20          **1.   Likelihood of Installation of Facilities**

21      TRPA argues that even without an injunction, construction of
22  piers and placement of new buoys is not likely to occur prior to
23  resolution of this case.  As to piers, TRPA contends that it does
24  not expect to issue permits until "mid-November or mid-December,
25  2009," and that any permit recipient will then need to wait an
26  uncertain period of time for various other agencies to issue

1   permits before any construction may begin.  As to buoys, TRPA
2   contends that it is unlikely that any replacement buoys will be
3   authorized until Summer of 2010, or that additional buoys will be
4   authorized until 2011.  Although plaintiffs also seek to enjoin
5   installation of "boat lifts, boat ramps, . . . boat slips" or other
6   "new boat facilities," TRPA has not addressed when such facilities
7   may be installed.

8       In this argument, TRPA presumes that the "likelihood" of
9   irreparable injury must be calculated in light of two separate
10  probabilities: the likelihood of such installation occurring prior
11  to resolution of the suit, and the likelihood that, if it occurs,
12  irreparable injury will result.  Even assuming that both factors
13  should be considered, the court rejects a factual predicate of
14  TRPA's argument: that if installation occurs on the above schedule,
15  the court will have resolved the matter before this time.  At the
16  parties' request, the court has set a special briefing schedule for
17  the parties' anticipated cross motions for summary judgment.
18  Pursuant to that order, and barring future delay, oral argument on
19  those motions will be heard on March 16, 2010.  Therefore, that
20  date is the absolute earliest that the matter will be resolved.
21  Past experience teaches the court that it is not unlikely that this
22  hearing will be delayed.  Even if the present schedule is observed,
23  it is not only possible but likely that no order will issue until
24  weeks, if not months, after the hearing date.  The federal courts
25  are in general overloaded, and the courts of this district are the
26  busiest in the country.  In light of this reality, the court

1   concludes that absent an injunction, installation of piers,

2   replacement buoys and other boating facilities is likely to occur

3   prior to resolution of this suit.[9]

4       Because the above disposes of the issue, the court does not

5   address TRPA's implicit premise that, when evaluating the

6   likelihood of irreparable injury, the court should consider the

7   likelihood of the potentially injurious act occurring absent an

8   injunction, and not just the likelihood that the act, if it occurs,

9   will cause irreparable injury.

10      **2.   Whether Injury Will Result from Replacement Buoys**

11      TRPA argues that even if the court determines that it is

12  likely that replacement buoys will be permitted and installed prior

13  to resolution of this suit, these buoys will not produce

14  irreparable injury.  TRPA's contention appears mistaken.

15      For this motion, it is undisputed that boating activity causes

16  irreparable injury.  It is also undisputed that removing illegal

17  buoys and replacing them with new buoys will result in higher

18  levels of boating than would removing illegal buoys without

19  authorizing replacements.  TRPA does not contend that its efforts

20  to remove buoys[10] are contingent on TRPA's ability to authorize

21  _____

22      [9] This court has had a vacancy for some months now, and by the
    numbers is entitled to double the number of active judges it now

23  has.  There is no indication the president will appoint a judge to
    the vacancy, and the last omnibus bill requested five rather than

24  six judges.  If attorneys and/or clients want service, they should
    start calling this district's plight to the attention of those who

25  can address it.

26      [10] The court notes that although TRPA has the ability to
    identify buoys as unpermitted, TRPA may lack the authority to

                                   12

1   replacements, and nothing indicates that TRPA would be permitted

2   to take such an approach.  Moreover, for purposes of this motion,

3   the court assumes that the League has shown a likelihood of success

4   on its claim, and that success would prevent TRPA from authorizing

5   replacement buoys.  Finally, as discussed in the preceding section,

6   it is likely that TRPA may permit new buoys prior to resolution of

7   this suit.    Accordingly,    absent   a   preliminary   injunction,

8   installation of replacement buoys and consequent irreparable injury

9   is likely.

10          **3.    Injury Resulting from Issuance of Permits**

11          Finally, TRPA argues that any environmental harm will only

12  result  from  installation  of  boat  facilities,  and  not  from  the

13  permits  themselves.    TRPA  therefore  encourages  the  court  to

14  distinguish permiting from construction in determining the scope

15  of injunctive relief, such that even if the court concludes that

16  construction  should  be  enjoined,  the  court  should  not  enjoin

17  issuance of permits.  In other words, TRPA argues that this court's

18  ability to provide full and effective relief will be protected by

19  an  injunction  that  allows  TRPA  to  issue  permits,  but  which

20  specifies that permits must prohibit actual construction prior to

21  resolution of this case.[11]   The court concludes that while courts

22

23  remove such buoys itself.

24          [11] TPRA confusingly refers to the narrower relief it requests
    as a "quasi-injunction."   There is nothing "quasi" about the
    injunction requested by TRPA or the one issued by the court in this
25  order.   The court simply issues a preliminary injunction which
    prohibits  a  narrower  range  of  activity  than  the  preliminary
26  injunction requested by the League.

1  have previously issued broader injunctions without discussion,
2  courts must now inquire into whether a narrower injunction
3  suffices.  In light of the Compact's substantive requirements that
4  will apply to any re-examination of the amendments, plaintiffs have
5  not shown that limited permits are likely to lead to irreparable
6  injury here.

7      The League's primary response to TRPA's argument is that in
8  a prior similar suit, the Ninth Circuit approved a preliminary
9  injunction analogous to the one the League seeks here.  In 1984,
10 the State of California and the League filed separate suits
11 challenging prior amendments to the regional plan, alleging among
12 other things that these amendments allowed TRPA to approve
13 development that would cause the environmental thresholds to be
14 exceeded.  The district court issued a preliminary injunction in
15 the state's suit, which was affirmed in three concurrently released
16 Ninth Circuit Opinions, all under the name <u>California ex rel. Van</u>
17 <u>De Kamp v. Tahoe Regional Planning Agency</u>.  The court refers to
18 these opinions as <u>Van De Kamp I</u>, 766 F.2d 1308; <u>Van De Kamp II</u>, 766
19 F.2d 1316; and <u>Van De Kamp III</u>, 766 F.3d at 1319 (9th Cir. 1985).
20 In these cases, the Ninth Circuit explained that "If the approval
21 process fails to ensure that the environmental thresholds are
22 observed," as plaintiffs alleged, "the environmental deterioration
23 at which the Compact is directed will continue. The district court
24 therefore properly enjoined the permit process itself, pending a
25 final decision on the merits of the claim that the permit approval
26 procedures do not protect the environment at Lake Tahoe." <u>Van De</u>

14

1  Kamp III, 766 F.2d at 1323-24.  In discussing whether irreparable

2  injury had been shown, the Ninth Circuit did not draw the

3  distinction TRPA requests here, between issuance of permits and the

4  permitted activities.   Id., Van De Kamp I, 766 F.2d at 1316.

5  Instead, the Ninth Circuit upheld the injunction of issuance of

6  permits on the ground that the permitted activities would cause

7  irreparable injury.  Van De Kamp I, 766 F.2d at 1316.

8      While the Van De Kamp cases did not consider whether a

9  narrower injunction of the type now sought by TRPA would prevent

10  irreparable injury, such an inquiry is now required.  After Winter,

11  a district court cannot take an "an all-or-nothing approach to

12  assessing the harms."  Sierra Forest Legacy v. Rey, __ F.3d __,

13  2009 WL 2462216, *4 (9th Cir. 2009).  Instead, the court must

14  "address[] the options actually on the table."  Id.  In Winter,

15  this meant addressing whether irreparable injury was likely to

16  absent an injunction that included two challenged restrictions, in

17  light of the fact that four other restrictions were already in

18  place.  Id. (citing Winter, 129 S.Ct. at 376).  In Rey, the Ninth

19  Circuit applied Winter to a suit challenging the "2004 Framework"

20  to certain forest plans adopted by the United States Forest

21  Service.  Id. at *1.  The district court's analysis and application

22  of the non-merits preliminary injunction factors "boiled down to

23  a choice between allowing USFS to move ahead with the 2004

24  Framework or requiring USFS to take no action at all with respect

25  to fire prevention."  Id. at *5.  The USFS appealed, arguing that

26  a narrower injunction would suffice.  The Ninth Circuit concluded

15

1 that the district court erred by failing to consider whether a
2 narrower injunction, such as one allowing the USFS to proceed under
3 the unchallenged "2001 Framework," would also serve to prevent
4 otherwise likely irreparable injury.  Id.

5      The court must therefore consider whether a narrower
6 injunction of the type proposed by TRPA will suffice, or whether
7 the conduct permitted by the narrower injunction is instead also
8 likely to cause irreparable injury.  The League argues that even
9 if permits prohibit construction or installation of facilities
10 prior to termination of this litigation, the issuance of such
11 limited permits will itself be likely to cause irreparable injury.

12      In this argument, the League primarily relies upon the First
13 Circuit's decision in Massachusetts v. Watt, 716 F.2d 946 (1st Cir.
14 1983), which held that the risk of bureaucratic commitment
15 constituted irreparable injury.  Watt concerned a challenge under
16 the National Environmental Policy Act, 42 U.S.C. § 4321 et seq.,
17 to a proposal to auction offshore oil leases.  Purchase of a lease
18 would not itself entitle the buyer to drill for oil, as several
19 subsequent permits needed to be acquired.  Id. at 951-52.  The
20 district court issued a preliminary injunction enjoining the
21 auction.  The federal defendants argued on appeal that "the
22 district court should have allowed the sale to proceed while the
23 court made a more thorough determination of its lawfulness.  If the
24 court were to find the lease sale unlawful, it could always set it
25 aside after the event."  Id.  In an opinion written by then-Judge
26 Breyer, the panel rejected this argument.

16

1
2
3
4
5
6
7
8
9
10
11
12

> [W]hen a decision to which NEPA obligations
> attach is made without the informed
> environmental consideration that NEPA
> requires, the harm that NEPA intends to
> prevent has been suffered. . . . [Setting]
> aside the agency's action at a later date will
> not necessarily undo the harm.  The agency as
> well as private parties may well have become
> committed to the previously chosen course of
> action, and new information -- a new EIS --
> may bring about a new decision, but it is that
> much less likely to bring about a different
> one.  It is far easier to influence an initial
> choice than to change a mind already made up.
> . . . [¶]  Once large bureaucracies are
> committed to a course of action, it is
> difficult to change that course -- even if
> new, or more thorough, NEPA statements are
> prepared and the agency is told to "redecide."
> It is this type of harm that plaintiffs seek
> to avoid, and it is the presence of this type
> of harm that courts have said can merit an
> injunction in an appropriate case.

13
14

Id. at 952-53 (internal citations omitted).

15
16
17
18

Watt has neither been clearly adopted nor rejected by the Ninth Circuit.  The only Ninth Circuit opinion to specifically discuss Watt was Northern Cheyenne Tribe v. Hodel, 851 F.2d 1152 (9th Cir. 1988).[12]  In Northern Cheyenne, plaintiffs challenged

19
20
21
22
23
24
25
26

---

[12] Watt was also cited by Judge Canby's partial dissent in Village of False Pass v. Clark, 733 F.2d 605 (9th Cir. 1984). False Pass did not concern a preliminary injunction–the issue was at what stage of the lease process a NEPA analysis needed to be performed.  Judge Canby followed Watt to conclude that the initial sale of a gas lease constituted an injury because even if this sale was not an irrevocable commitment of resources, it was a decision that was difficult to undo, and that a proper NEPA analysis needed to be completed beforehand.  Id. at 619 (Canby, J., concurring in part and dissenting in part).  The majority concluded that because an Environmental Impact Statement would be performed later in the process, and because at that point the agency would have essentially the same discretion to cancel or modify the project as was available at the earlier stage, an earlier EIS was unnecessary. Id. at 615-16.

various coal leases under NEPA.  However, while plaintiffs in <u>Watt</u> challenged leases that had not yet occurred, plaintiffs in <u>Northern Cheyenne</u> did not seek an injunction until the leases had already been sold.  851 F.2d at 1154.  The district court granted summary judgment to plaintiff, and entered a permanent injunction which suspended the leases pending issuance of a new EIS.  <u>Id.</u> at 1157. Plaintiff appealed, arguing that the court should have voided the leases.  The Ninth Circuit affirmed.  Citing <u>Watt</u>, the panel agreed with the First Circuit that "[b]ureaucratic rationalization and bureaucratic momentum are real dangers."  <u>Id.</u>  This was particularly so where the lessees had made investments based on these leases, which the agency would be aware of when it re-evaluated the leases on remand.  However, the panel held that "the Tribe failed to demonstrate any significant difference between voiding and suspending the leases."  <u>Id.</u>  Nor could the panel discern any such difference.  "We see no reason to suppose that the Secretary will feel greater commitment to the original project if the leases are not voided but held in abeyance until a new evaluation is made."  <u>Id.</u>  Absent such a showing, the panel explained that "[w]e assume the Secretary will comply with the law."  <u>Id.</u>  The panel concluded that an injunction "specifically direct[ing] the Secretary not to consider prior investments by the lessees when he reconsiders the lease sale" would suffice.  <u>Id.</u>

    The factual differences be <u>Watt</u> and <u>Northern Cheyenne</u> may be significant.  <u>Northern Cheyenne</u> considered a decision that had already been made, and found that the choice between suspending and

18

1   voiding the decision's results made no difference in terms of

2   possible agency commitment to that decision. Watt concluded that

3   enjoining the agency from making the decision in the first place

4   does make a meaningful difference. A later First Circuit NEPA case

5   used this factual difference to distinguish Watt, explaining that

6   a preliminary injunction only avoids bureaucratic inertia if it is

7   issued prior to a decision being made in the first instance.

8   Conservation Law Found. v. Busey, 79 F.3d 1250, 1272 (1st Cir.

9   1996).   Other district courts within the Ninth Circuit have

10  followed the First Circuit's decision in Watt since the Ninth

11  Circuit's decision in Northern Cheyenne.   See Idaho ex rel.

12  Kempthorne v. United States Forest Serv., 142 F. Supp. 2d 1248,

13  1264 (D. Idaho 2001), further proceeding at 2001 U.S. Dist. LEXIS

14  21990 (D. Idaho May 10, 2001); Friends of Earth v. Hall, 693 F.

15  Supp. 904, 913 (W.D. Wash. 1988).

16      This court need not decide whether the danger of bureaucratic

17  inertia as identified by Watt may constitute a likelihood of

18  irreparable injury in the Ninth Circuit, because distinctions

19  between the EIS analyses under NEPA and the Tahoe Regional Compact

20  minimize this danger here.   As noted above, NEPA imposes no

21  substantive obligations on agency decisions.   See 42 U.S.C. §

22  4332(C).  Thus, even if an agency reaches a decision on the basis

23  of an invalid EIS, then completes a proper EIS that reveals severe

24  environmental impacts that had not been previously considered, the

25  agency may re-adopt the prior decision.   If this occurs, a

26  reviewing court cannot determine whether the agency gave proper

1   consideration to information contained in the proper EIS, or

2   whether the agency instead re-adopted the prior position or a

3   derivative thereof because of bureaucratic inertia. Watt, 716 F.2d

4   at 952.   Under the Compact, however, when an EIS identifies

5   significant environmental impacts, TRPA is prohibited from

6   approving the project unless the project is modified to reduce

7   those impacts to a "less than significant level" or the EIS

8   provides specific justification as to why such modification is

9   infeasible.   Code § 5.8.D; see also Compact art. VII(d)(1), (2).

10  Although the compact's EIS provisions also serve a broader

11  informative function, the substantive requirements lessen the risk

12  that the agency will give only cursory or illusory consideration

13  to information contained in a future EIS.   This fact, coupled with

14  this court's reluctance to presume that government actors will

15  violate the law, Northern Cheyenne, 851 F.2d at 1157, leads to the

16  conclusion that the League has not shown that issuance of permits

17  will itself likely result in irreparable injury in the form of

18  potential agency commitment to an improperly adopted course of

19  action.

20       The League also alludes to the possibility that if permits are

21  issued and the League then succeeds on its claims, TRPA will be

22  legally, rather than institutionally, constrained in its ability

23  to take a fresh look at the amendments.   The League understandably

24  predicts that "approval of conditional permits would create

25  unrealistic expectations of a right to construct a pier" in permit

26  recipients.   However, the League properly recognizes that such

1  expectations are "unrealistic," in that the limited and conditional

2  permits that may be issued under TPRA's proposed narrow injunction

3  would not give rise to any right that would limit this court's

4  ability to provide effective relief, including an order directing

5  TRPA to vacate or modify these permits.  Nonetheless, the court

6  will modify TRPA's proposed injunction to make this limitation

7  explicit.  Accordingly, the issuance of permits will at most give

8  rise to the type of institutional commitment described in <u>Watt</u>,

9  which this court has found to be overcome by the Compact's

10 substantive requirements.

11      Although the League has succeeded in showing that construction

12 or installation of boating facilities is likely to cause

13 irreparable injury, a narrower injunction of the type proposed by

14 TRPA will suffice to avoid this injury.  <u>Rey</u>, __ F.3d at __, 2009

15 WL 2462216, *4.

16 **C.   Balance of Hardships and the Public Interest**

17      The narrow injunction is consistent with both the balance of

18 hardships and the public interest in this case.  TRPA argues that

19 it will suffer hardship if it is enjoined from processing and

20 issuing permits.  The narrow injunction avoids these harms, and

21 TRPA does not identify any hardship under this injunction.

22      The property owners will suffer some hardships under any

23 injunction, whether narrow or broad.  These hardships do not

24 overcome the showing of likelihood of irreparable injury.  Given

25 the possibility (assumed to be a likelihood for purposes of this

26 motion) that the League will succeed, it appears to the court that

1 the property owners might be collectively better off under a broad

2 injunction, because the narrow injunction will encourage them to

3 spend resources on permits that may be revoked.   However, the

4 Shorezone Property Owners have joined in TRPA's position that a

5 narrower injunction is preferrable to a broad one.

6 　　　The League argues that they will suffer hardships under the

7 narrow injunction because permit recipients will seek to intervene

8 in this case, complicating the litigation.   The court will

9 adjudicate motions to intervene as they arise, but the possibility

10 that some intervenors will join the suit does not demonstrate a

11 hardship compelling a different result.

12 　　　The public interest favors environmental protection, as

13 demonstrated by the compact itself. <u>Van De Kamp I</u>, 766 F.2d at

14 1316.   TRPA has not identified any countervailing public interest.

15 Accordingly, the narrow injunction--which suffices to avoid the

16 likelihood of irreparable environmental injury--is in the public

17 interest.

**IV. CONCLUSION**

18

19 　　　For the reasons stated above, the League's motion for a

20 preliminary injunction is GRANTED IN PART.

21 　　　It is hereby ORDERED that the Tahoe Regional Planning Agency

22 ("TRPA") prohibit, until the Court resolves the merits of this

23 case, construction or placement of any new boating facilities (i.e.

24 piers, buoys, boat lifts, boat ramps and boat slips not in Lake

25 Tahoe as of the effective date of the Shorezone Ordinance

26 Amendments adopted by the TRPA Governing Board on October 22, 2008)

1  in Lake Tahoe pursuant to the Shorezone Ordinance Amendments.  For

2  purposes of this prohibition, "new" buoys include buoys that

3  replace previously existing illegal or unpermitted buoys.  TRPA

4  MAY, however, continue to process and issue conditional permits for

5  new boating facilities, provided that such permits contain (1) a

6  term prohibiting construction or placement of new boating

7  facilities in Lake Tahoe until this Court resolves the merits of

8  the underlying litigation and (2) a term informing the permitee

9  that the permit is conditional upon the resolution of this suit,

10  and that the permit may be revoked or modified by order of this

11  court without compensation to the permitee.  TRPA is preliminarily

12  ENJOINED from issuing permits not in compliance with this order.

13      Because this litigation is brought by non-profit organizations

14  to protect the public interest in the protection and preservation

15  of Lake Tahoe, no bond shall be required of plaintiffs.

16      IT IS SO ORDERED.

17      DATED:  September 17, 2009.

18

19

20      LAWRENCE K. KARLTON
        SENIOR JUDGE
21      UNITED STATES DISTRICT COURT

22

23

24

25

26

23