UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LEAGUE TO SAVE LAKE TAHOE
and SIERRA CLUB,

     Plaintiffs,

    v.

TAHOE REGIONAL PLANNING
AGENCY,

     Defendant.

_____/

NO. CIV. S-08-2828 LKK/GGH

O R D E R

Development in the Lake Tahoe region is regulated by the Tahoe Regional Planning Agency ("TRPA").  TRPA amended its "shorezone" ordinances on October 22, 2008.  Plaintiffs League to Save Lake Tahoe and the Sierra Club challenge these amendments, arguing that in adopting them TRPA violated the Tahoe Regional Planning Compact and the implementing Code of Ordinances.

Pending before the court are cross motions for summary judgment on liability.  The California State Lands Commission has filed a brief supporting plaintiffs and the Shorezone Property Owners Association has filed a brief supporting TRPA.  The court

1

1 resolves the matters on the papers and after oral argument.

2 **I. Background[1]**

3 **A.   Lake Tahoe**

4     For well over a century, writers have praised Lake Tahoe's

5 beauty.  See Tahoe-Sierra Pres. Council v. TRPA, 535 U.S. 302, 307

6 (2002) (quoting Mark Twain, Roughing It 174-75 (1872)).  For over

7 forty years, government has struggled to preserve this treasure.

8 Id. at 308.  With mixed optimism and pessimism, the court expects

9 both the praise and the struggle to continue.

10     Lake Tahoe is an alpine lake located in the northern Sierra

11

12     [1] The facts discussed by the court are undisputed unless
13 otherwise noted.  The League, TRPA, and Shorezone Property Owners
Association have requested judicial notice of various government
14 documents or decisions.  Although review of the challenged decision
is made on the administrative record, the submitted documents that
15 predate the decision or constitute aspects of the amended
ordinances themselves may supplement the record.  No party has
16 objected to judicial notice of the pre-decision documents.  All of
these exhibits are judicially noticeable within the meaning of Fed.
17 R. Evid. 201.
     TRPA and Shorezone Property Owners Association further request
18 judicial notice of documents post-dating the challenged decision,
including TRPA's 2009 decision to postpone consideration of pier
19 applications until 2011, TRPA's 2010 Annual Shorezone Program
Report dated March 17, 2010, and the Blue Boating Program Phase II
20 Implementation Plan dated March 24, 2010.  Insofar as the instant
suit concerns whether TRPA's 2008 decision to adopt the Amendments
21 was supported by the record, these after-the-fact documents have
limited relevance, if any.  "[I]t is not 'appropriate . . . to use
22 post-decision information as a new rationalization either for
sustaining or attacking the Agency's decision.'" Rybachek v. U.S.
23 Envtl. Prot. Agency, 904 F.2d 1276, 1296 (9th Cir. 1990) (quoting
Ass'n of Pac. Fisheries v. Envtl. Prot. Agency, 615 F.2d 794, 811
24 (9th Cir. 1980)).  TRPA suggests that the court consider these
exhibits as "events indicating the truth or falsity of agency
25 predictions[, which] should not be ignored." Amoco Oil Co. v.
Envtl. Prot. Agency, F.2d 722, 729 n.10 (D.C. Cir. 1974).  The
26 court declines to adopt this rationale for considering the
exhibits.

2

Nevada Mountains and spanning the California-Nevada border.  The
lake is famous for its exceptional clarity, "which depends largely
on the amount of suspended fine sediments and, to a lesser degree,
algal productivity."  Administrative Record at Volume 7, page 4046
(hereinafter "AR Vol.:Page").  The amount and productivity of algae
is in turn largely a function of the amount of nutrients in the
water.  Id.  Beginning around the 1960s, human activity in the area
began increasing the amount of nutrients and sediments in the lake,
initiating what has been a steady decline in water clarity.  Id.,
see also AR 11:7313.  Although visibility previously extended to
over 100 feet below the lake's surface, over 30% of this visibility
has been lost.  AR 7:4201, 4045, 11:7313.

Water clarity is not the only aspect of the lake to have
suffered.  The Lake Tahoe Basin has also suffered from degradation
of other measures of water and air quality.  Many of the aesthetic
and recreational values of the region have been impaired, including
scenery, noise, and the ability to use the lake for recreational
purposes.

A major cause of these declines is development in the basin.
Onshore development introduces nutrients and sediment by, among
other things, eliminating wetlands and undisturbed lands that
filter runoff and by increasing sewer line exfiltration and septic
leachate.  See also Tahoe-Sierra Pres. Council, 535 U.S. at 308.
Piers and other structures that enable boating also impact
protected values, such as fish habitat and recreation.  AR 6:4007,
7:4173.  Separate from the effects of development, emissions from

3

1  motorized watercraft harm air and water quality, including water

2  clarity.

3  **B.    The Tahoe Regional Compact & TRPA's Regulation**

4       Efforts to address these problems have been shaped by the fact

5  that jurisdiction over the Lake Tahoe Basin is shared by the States

6  of California and Nevada, five counties, several municipalities,

7  and the United States Forest Service.  Tahoe-Sierra Pres. Council,

8  535 U.S. at 308.   In 1968, the legislatures of the two States

9  adopted the Tahoe Regional Planning Compact, which Congress

10 approved in 1969.   In 1980, the initial Compact was amended "to

11 increase the level of environmental protection for the Basin as a

12 whole."  Tahoe-Sierra Pres. Council, Inc. v. TRPA, 322 F.3d 1064,

13 1071 (9th Cir. 2003); see also 1980 Cal. Stat. ch. 872, p. 2710 §

14 2 (codified as amended at Cal. Gov't Code § 66801); 1980 Nev. Stat.

15 1 (codified at Nev. Rev. Stat. 277.200); Act of Dec. 19, 1980, Pub.

16 L. No. 96-551, 94 Stat. 3233.   The Compact is "federal law" for

17 purposes of jurisdiction under 28 U.S.C. § 1331 and is interpreted

18 pursuant to federal principles of statutory interpretation.  League

19 to Save Lake Tahoe v. TRPA, 507 F.2d 517, 525 (9th Cir. 1974), Lake

20 Tahoe Watercraft Rec. Ass'n v. TRPA, 24 F. Supp. 2d 1062, 1068

21 (E.D. Cal. 1998).

22      The 1980 Compact (hereinafter "Compact") directed TRPA to

23 develop regional "environmental threshold carrying capacities"

24 Compact art. I(b) and V(b).   Environmental threshold carrying

25 capacities ("thresholds") are environmental standards "necessary

26 to maintain a significant scenic, recreational, educational,

4

scientific or natural value of the region or to maintain public health and safety within the region" and "shall include but not be limited to standards for air quality, water quality, soil conservation, vegetation preservation and noise." Compact art. II(I). TRPA has adopted 36 separate threshold standards, including standards for water clarity and quality, air quality, noise levels, recreational access, and scenic quality. See, e.g., AR 29:19179-94 (TRPA Resolution 82-11, as amended) (adopting initial thresholds), AR 11:7207 (discussing thresholds presently in effect).

TRPA must regulate the region in order to achieve these thresholds "while providing opportunities for orderly growth and development consistent with such capacities." Compact art. I(b). One aspect of TRPA's regulation is promulgation of generally-applicable rules and plans. Most broadly, TRPA adopted a Regional Plan in 1987. This document is "a single enforceable plan" that includes many correlated elements relating to the regulation of the Basin, including "[a] conservation plan for the preservation, development, utilization, and management of the scenic and other natural resources within the basin." Compact art. V(c)(3). The Regional Plan is implemented by the Code of Ordinances and the Rules of Procedure promulgated by TRPA. See Comm. for Reasonable Regulation of Lake Tahoe v. TRPA, 311 F. Supp. 2d 972, 979-80 (D. Nev. 2004).

TRPA also regulates on a project-specific basis. Before approving any project, TRPA must ensure that the project will not interfere with implementation of the regional plan or cause the

1  thresholds to be exceeded.  Compact art. V(g).  TRPA must also
2  prepare an environmental impact statement ("EIS") for the project,
3  similar to the reporting required by the National Environmental
4  Policy Act, 42 U.S.C. § 4321 et seq. ("NEPA") and the California
5  Environmental Quality Act, CAL. PUB. RES. CODE §§ 2100-21176
6  ("CEQA").  Compact art. VII(a)(2).  A project cannot be approved
7  unless either "changes or alterations" have reduced "the
8  significant adverse environmental effects to a less than
9  significant level" or the agency determines that mitigation is
10  "infeasible."  Compact art. VII(d)(1) and (2).

11  **C.   The 2008 Shorezone Amendments**

12      On October 22, 2008, TRPA's governing board adopted the
13  Shorezone Amendments.  AR 1:1-3.  These Amendments' provisions
14  regarding piers, buoys, and other boating facilities form the core
15  of this case.

16      Prior to the Amendments, a rule designed to protect fish
17  habitat was the primary limit on construction of boating
18  facilities.  Approximately two thirds of the lakeshore was
19  designated as "prime fish habitat," which included habitat needed
20  for spawning, fish feed and cover, or within 200 feet of designated
21  spawning streams.  See AR 6:3860.  In these areas new construction
22  was prohibited and existing structures could only be modified when
23  the modification would "decrease in the extent to which the
24  structure does not comply with the development standards" and would
25  improve attainment or maintenance of threshold standards.  Id., AR
26  3:1884-88.

1    In the process leading up to the Amendments, TRPA concluded

2 that the above prohibition went beyond what was necessary for fish

3 protection, a conclusion plaintiffs do not challenge here.   AR

4 2:734-62.  The Amendments repealed the prohibition on construction

5 in fish habitat, allowing new facilities to be constructed within

6 certain other limits.  Most notably, the amended ordinances place

7 numeric caps on the number of boating facilities that can be placed

8 on the lake.  The Amendments allow an additional 128 private piers,

9 10 public piers, 1,862 new mooring buoys, 6 new boat ramps, and 235

10 boat slips to be constructed or placed within Lake Tahoe's

11 Shorezone.  TRPA Amended Code of Ordinances §§ 52.2.B, 52.4.B, 52.5

12 (hereinafter "Code").  In addition to these "new" facilities, the

13 Amendments allow TRPA to issue permits for buoys that are already

14 on the lake but that are unpermitted; TRPA may also authorize buoys

15 to replace these unpermitted buoys if and when the unpermitted

16 buoys are removed.  Compared to the maximum potential build-out

17 under the former rule, the Amendments increase the maximum for

18 piers and buoys but reduce the cap on boat ramps and slips.[2]

19    The EIS recognizes that development of boating facilities

20

21    [2] Although the prior code of ordinances did not set a
numerical limit on boating facilities that could be permitted, TRPA
22 estimated that the spatial prohibition would in effect allow the
total numbers (existing plus potential) to rise to 839 piers, 5,826
23 buoys, 128 ramps, and 3,144 slips.  The Amendments permit a total
of 906 piers, 6,316 buoys, 43 ramps, and 2,929 slips.  Compare AR
2:734 with 3:1189.
24    In this litigation, TRPA and the Shorezone Property Owners
argue that because the Amendments limit construction in ways beyond
25 the numeric cap it is unlikely that the full 128 additional private
piers will be constructed.  The EIS, however, assumes that all 128
26 piers will be built.

7

1  could negatively impact air and water quality, recreational access,

2  scenery, and noise.   The Amendments adopt measures to mitigate

3  these impacts, and the EIS concluded that these measures mitigate

4  impacts to a "less than significant" level.  AR 1:1, 78-80.  TRPA

5  concluded that as a result of this mitigation, the Amendments

6  satisfy the obligation to maintain and achieve thresholds.  AR 1:1,

7  22-23.   Plaintiffs argue that both of these conclusions were

8  arbitrary and capricious.   Plaintiffs relatedly argue that the

9  unmitigated   impacts   will   violate   the   obligation   to   avoid

10 degradation of the lake as an "Outstanding National Resource Water"

11 under the Clean Water Act.

## II. Standard

13      The majority of plaintiffs' claims arise under the Compact

14 itself.  The Compact provides a private cause of action for suits

15 alleging   that   TRPA's   "act   or   decision   has   been   arbitrary,

16 capricious or lacking substantial evidentiary support or [that] the

17 agency has failed to proceed in a manner required by law."  Art.

18 VI(j)(5); see also Code § 6.2A.   The parties characterize this

19 standard of review as essentially the same as that employed under

20 the Administrative Procedure Act ("APA").   5 U.S.C. § 706(2)(A),

21 (E); but see Comm. for Reasonable Regulation of Lake Tahoe, 311 F.

22 Supp. 2d at 989 (discussing the "substantial evidence" aspect of

23 the Compact standard).

24      As noted above, plaintiffs also argue that TRPA has violated

25 the Clean Water Act's anti-degradation policy for "Outstanding

26 National Resource Waters."   The parties have not discussed the

8

1  cause of action authorizing this claim, but it appears that this

2  claim is brought under the Compact by virtue of the Compact's

3  incorporation of state and federal water quality guidelines.  The

4  parties agree that the arbitrary and capricious standard applies

5  to this claim.

6       Suits challenging agency action under such standards generally

7  do not present factual disputes, and thus do not implicate the

8  ordinary standards for summary judgment.  Conservation Cong. v.

9  U.S. Forest Serv., 555 F. Supp. 2d 1093, 1100 (E.D. Cal. 2008)

10 (citing Occidental Eng'g Co. v. INS, 753 F.2d 766, 769-70 (9th Cir.

11 1985)).  An agency decision is arbitrary or capricious for purposes

12 of the APA where the agency "relied on factors Congress did not

13 intend it to consider, entirely failed to consider an important

14 aspect of the problem, or offered an explanation that runs counter

15 to the evidence before the agency or is so implausible that it

16 could not be ascribed to a difference in view or the product of

17 agency expertise."  Lands Council v. McNair, 537 F.3d 981, 987 (9th

18 Cir. 2008) (en banc) (quotations omitted).  The agency "must

19 articulate a rational connection between the facts found and the

20 conclusions reached."  Earth Island Inst. v. U.S. Forest Serv., 442

21 F.3d 1147, 1157 (9th Cir. 2006) (citing Midwater Trawlers Co-op.

22 v. Envtl. Def. Ctr., 282 F.3d 710, 716 (9th Cir. 2002)).

23      This standard is especially appropriate when reviewing factual

24 determinations that implicate an agency's scientific expertise.

25 Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, BLM, 273 F.3d

26 1229, 1236 (9th Cir. 2001).  Even for scientific questions,

1  however, a court must intervene when the agency's determination is

2  counter to the evidence or otherwise unsupported.  See, e.g.,

3  Sierra Club v. U.S. Envtl. Prot. Agency, 346 F.3d 955, 962 (9th

4  Cir. 2003), amended by 352 F.3d 1187 (9th Cir. 2003) (rejecting

5  agency's factual conclusion about cause of air quality exceedance).

6                              **III. Analysis**

7       Plaintiffs argue that adoption of the Amendments violated two

8  provisions of the Compact.  First, the obligation to ensure that

9  the Code, as amended, implements the Regional Plan in a way that

10 will achieve and maintain the thresholds and second, the obligation

11 to ensure that the Amendments' adverse impacts were mitigated to

12 a "less than significant" level.  For the reasons explained below,

13 TRPA's conclusion that the Amendments satisfy these two obligations

14 was arbitrary and capricious.

15      In a claim that is largely derivative of the above, plaintiffs

16 argue that the Amendments violated the Clean Water Act's

17 antidegradation policy for Outstanding National Resource Waters.

18 Because TRPA has not shown that the Amendments' water quality

19 impacts will be mitigated, TRPA's conclusion that the Amendments

20 comport with this policy was also arbitrary and capricious.

21 **A.   The Obligation to Achieve and Maintain Thresholds**

22      TRPA's obligation to "achieve and maintain" the environmental

23 thresholds is reiterated throughout the Compact.  In particular,

24 TRPA must ensure that "at a minimum, the [Regional Plan] and all

25 its elements, as implemented through agency ordinances, rules and

26 regulations, achieves and maintains" the thresholds.  Compact art.

10

1  V(c); <u>see also</u> Code § 6.5.   In adopting the Amendments, TRPA

2  concluded that this obligation was satisfied because the project

3  included mitigation measures that would ensure that the Amendments

4  had no significant adverse effects.   AR 1:22-23.[3]  As to this, the

5  court states in part III(B) below, the predicate finding that the

6  project would not have significant impacts on air quality, water

7  quality,  recreational  access,  and  noise  is  arbitrary  and

8  capricious.

9       More fundamentally, however, TRPA misunderstands the nature

10  of the obligation to achieve and maintain the thresholds.   It is

11  not enough to show that the Amendments do not make the problem

12  worse.  TRPA must ensure that the ordinances, as amended, implement

13  the  regional  plan  in  a  way  that  will  actually  achieve  the

14  thresholds.  With regard to thresholds not presently in attainment,

15  TRPA's finding that the Amendments will not aggravate the problem

16  is inadequate.

17       **1.   The "Achieve and Maintain" Obligations**

18       Three provisions of the Compact oblige TRPA to achieve and

19  maintain the thresholds.   Article I(b) compels TRPA to "adopt and

20  enforce a regional plan and implementing ordinances which will

21  achieve and maintain [the thresholds] while providing opportunities

22  for  orderly  growth  and  development  consistent  with  [them]."

23  Article V(c) provides that once TRPA adopts thresholds, TRPA must

24

25       [3] The court acknowledges that item 1 of TRPA's "Chapter 6
    Findings" regarding the Amendments is ambiguously worded.   The
26  court's interpretation of this finding is informed by the position
    taken by TRPA in its briefing and at oral argument.

1  "amend the regional plan so that, at a minimum, the plan and all

2  its elements, as implemented through agency ordinances, rules and

3  regulations, achieves and maintains" the thresholds.  In light of

4  these provisions, TRPA has adopted an ordinance specifying that

5  before the ordinances, rules, or other programs may be amended,

6  TRPA must find that, <u>inter alia</u>, "the Regional Plan and all of its

7  elements, as implemented through the Code, Rules and other TRPA

8  plans and programs, as amended, achieves and maintains the

9  thresholds."  Code § 6.5.  Finally, a third provision of the

10 Compact, which applies to "projects" in general rather than

11 specifically to the Regional Plan and ordinances, provides that

12 prior to approving any project, TRPA must conclude that the project

13 "will not adversely affect implementation of the regional plan and

14 will not cause the adopted environmental threshold carrying

15 capacities of the region to be exceeded."  Compact art. V(g).

16     Under these provisions, amendments to the ordinances face a

17 higher burden than individual projects.  In approving individual

18 projects, article V(g) merely requires that TRPA find that the

19 project will not cause any threshold to be "exceeded."  <u>Id.</u>  A

20 finding that the project will not make matters worse suffices under

21 this standard.  Article V(g) applies to amendments to the

22 ordinances because an amendment is a "project" under the Compact.

23 <u>Id.</u> art. I(h).  Such amendments are also subject to the higher

24 standard under Code § 6.5, however, which requires a finding that

25 "the Regional Plan . . . , *as implemented through the Code . . .*

26 *as amended*, achieves and maintains the thresholds."  (emphasis

12

added).  Section 6.5 explains that this finding is "in addition to" the findings required for projects generally.  Where a threshold is not in attainment, a finding that the problem is not getting worse does not satisfy this provision.  Nor is it sufficient to find that, metaphorically, the ball is moving forward.  By requiring that the Regional Plan be implemented so as to "achieve," rather than merely "approach," the thresholds, the Compact and Ordinances require a finding that TRPA will make it to the goal. TRPA is correct that Code section 6.5 looks to the entire package of the regional plan, ordinances, etc., rather than to effects specifically attributable to the proposed amendment.  Thus, it does not matter whether the proposal at issue will make the scoring shot, or even whether it will be involved in the play.  The key is the finding that, one way or another, the thresholds will be achieved.[4]

TRPA argues that this interpretation conflates the requirements of Code sections 6.4 and 6.5.  Code section 6.4 provides that before amending the Regional Plan, TRPA must find "that the Regional Plan, as amended, achieves and maintains the

---

[4] In an argument raised for the first time in plaintiffs' reply, plaintiffs argue that TRPA's failure to establish "Reasonable Progress Lines" ("RPLs") for the thresholds precludes a finding that the thresholds will be achieved.  Pls.' Reply 2-3. It may be that RPLs would facilitate achieving thresholds or determining whether thresholds will be achieved.  It may also be that failure to establish RPLs is itself unlawful.  The court does not decide these issues.  The court is not persuaded TRPA cannot determine whether the thresholds will be attained without the assistance of RPLs.  If plaintiffs wish to challenge the failure to establish RPLs, that is a claim for another lawsuit.

1   thresholds."  The Compact and Code recognize that the Regional Plan

2   is  not  a  complete  regulatory  scheme,  as  demonstrated  by  the

3   requirement that TRPA adopt ordinances and regulations in order to

4   implement the plan.  <u>See, e.g.</u>, Compact art. I(b), VI(a).  Thus,

5   the section 6.4 finding is not a finding that the Regional Plan,

6   standing in isolation, will suffice to achieve the thresholds.  The

7   Regional  Plan  must  be  implemented  through  ordinances,  and  the

8   details of that implementation matter.  In this suit, plaintiffs

9   do not challenge the adequacy of the Regional Plan, implying the

10  view that although the Regional Plan *could* be implemented in a way

11  that  would  achieve  the  thresholds,  the  proposed  implementation

12  falls short.  Code section 6.5 recognizes the viability of this

13  type  of  argument  by  imposing  on  amendments  to  ordinances  a

14  requirement that is separate from, but similar to, the requirement

15  for an amendment to the Regional Plan.  <u>See also</u> <u>Cal. ex rel. Van</u>

16  <u>De Kamp v. TRPA</u>, 766 F.2d 1308, 1314 (9th Cir. 1985) (TRPA's

17  finding that project was consistent with the Regional Plan was

18  itself insufficient to satisfy the requirement imposed by Compact

19  art. V(g), notwithstanding TRPA's interpretation of the Compact to

20  the contrary.).

21      Finally,  TRPA  argues  that  this  interpretation  leads  to  an

22  absurd result.  The language of the Compact and Code is clear in

23  this regard, and a party arguing that the court should depart from

24  the plain language on the basis of absurdity faces a heavy burden.

25  <u>Pac. Bell Tel. Co. v. Cal. PUC</u>, 597 F.3d 958, 969 (9th Cir. 2010)

26  (citing <u>Safe Air for Everyone v. Envtl. Prot. Agency</u>, 488 F.3d

14

1088, 1097 (9th Cir. 2007)), <u>Cumbie v. Woody Woo, Inc.</u>, 596 F.3d 577, 582 (9th Cir. 2010).  TRPA argues that it would be absurd to prevent TRPA from amending the ordinances until all thresholds are in attainment.  The court agrees that this would be absurd, but the plain language does not create such a prohibition.  Section 6.5 does not require a finding that thresholds have been *achieved*, it requires a finding that the amended ordinances implement the plan in a way that *achieves* them.  Many of the thresholds were set for levels ambitiously more protective than then-prevailing conditions, demonstrating a clear understanding that the thresholds would not be immediately achieved. AR 29:19179-94.  This was consistent with the restorative purpose of the Compact. <u>See, e.g.</u>, Compact art. I(a)(7).  Thus, TRPA may satisfy section 6.5 by finding that the amended ordinances, <u>etc.</u>, implement the Regional Plan in a way that will achieve the thresholds in the future.[5]  In light of this clarification, ascribing the plain meaning to "achieves," rather than interpreting the word to mean "moves toward" or something similar, does not produce a result so unworkable as to be absurd.[6]

---

[5] To be meaningful, the obligation to achieve the thresholds must carry with it some requirement of timeliness.  The scope of this requirement is not relevant to this suit.

[6] Although the parties have not briefed the issue, it appears that the States' choice of words was rational.  TRPA acknowledges that attainment of the thresholds will require both avoidance of future harm and "repair [of] ongoing environmental damage through restoration projects (correcting the 'sins of the past')."  TRPA's Brief at 3.  The Shorezone Property Owners' brief demonstrates that one way to correct these sins is by offering new piers as a regulatory 'carrot' that incentivizes landowners to cure unrelated existing damaging conditions.  TRPA must have a finite number of such carrots and sticks.  Therefore, before changing the way in

1       **2.   TRPA's Findings that The Regional Plan, As Implemented,**

2             **Would Achieve and Maintain the Thresholds**

3       Having clarified the scope of TRPA's duty, the court turns to

4  the individual thresholds.   TRPA has promulgated thirty-six

5  distinct thresholds.   See, e.g., AR 11:7207.   Twelve of these

6  concern soil conservation, vegetation, fisheries or wildlife,

7  topics on which plaintiffs provide no argument or discussion.   Of

8  the remaining twenty-four, many appear to have little connection

9  to motorized boating or boating facilities.   These include, for

10 example, thresholds for wood smoke, tributary water quality, water

11 quality in other lakes, and aircraft noise.   While plaintiffs refer

12 to some thresholds in this second group in passing, plaintiffs

13 provide no argument regarding the pertinence of these thresholds

14 to this suit.   The parties have not addressed whether TRPA must

15 make findings regarding every threshold for every project or

16 amendment, e.g., whether TRPA may amend an aspect of the ordinances

17 dealing with boating without finding that the threshold for onshore

18 impervious coverage of soil is achieved.   Because plaintiffs rest

19 their claims on thresholds argued to be affected by boating and

20 boating facilities, the court limits its analysis to those

21 thresholds.

22      So understood, plaintiffs invoke fourteen thresholds.   These

23 are the air quality thresholds for carbon monoxide, ozone,

24 particulates, and atmospheric nutrients; water quality thresholds

25 ────────────────

26 which TRPA employs these opportunities, TRPA must plan ahead to
   ensure that the overall effect will attain the thresholds.

1  for winter clarity and phytoplankton; both recreation thresholds;

2  all four scenic thresholds; and noise thresholds for single events

3  and community noise.  When the Amendments were adopted, the most

4  recent data on threshold attainment and trends was TRPA's "2006

5  Threshold Evaluation," dated September 2007. AR 11:7187.  This

6  assessment concluded that of these fourteen thresholds, only the

7  two recreation thresholds were in attainment.  AR 11:7207.

8      As noted above, TRPA based its achievement finding on the

9  conclusion that the Amendments would not have significant adverse

10  impacts.  AR 1:21-22.  For those thresholds that have not been

11  attained, Code § 6.5 requires more, i.e., a showing that something-

12  -whether the Amendments or something else--will provide the

13  necessary improvement.  TRPA asserts that "TRPA could, if required,

14  find that the Regional Plan attains and achieves [the] thresholds."

15  TRPA Reply, at 4.  In review of agency action, a finding that the

16  agency did not make cannot justify an agency decision, regardless

17  of whether the agency could have made the finding.  "[A]n agency's

18  action must be upheld, if at all, on the basis articulated by the

19  agency itself."  Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto.

20  Ins. Co., 463 U.S. 29, 50 (1983).

21      If the agency had actually made the requisite finding

22  elsewhere, that finding could have been incorporated by reference.

23  TRPA's decision did not refer to any such finding, AR 1:21-22, and

24  TRPA has not argued that such a finding exists.  At most, TRPA

25  points to a resolution that sets target dates for attainment of

26  most thresholds.  See TRPA's Second Request for Judicial Notice,

17

1  Ex. 2 (TRPA Resolution 2007-17).  Mere setting of targets is not

2  the same as concluding that the agency has adopted a course of

3  action that will meet the targets, and TRPA has not argued that

4  this resolution constituted a determination that the ordinances,

5  etc., as they existed at the time of this resolution would

6  implement the plan so as to achieve the thresholds.  Where the

7  court is brought to inquiring whether documents not referred to in

8  the challenged decision implied conclusions that the agency does

9  not attribute to them or any other document, the court has ventured

10  far beyond the bounds of arbitrary and capricious review.[7]

11      The recreational thresholds, however, present a different

12  question.  The court ultimately concludes that TRPA's finding

13  regarding these thresholds was arbitrary and capricious, because

14  the court rejects TRPA's predicate finding that the Amendments

15  would not significantly adversely affect recreation, as explained

16  in part III(B)(3) below.  Insofar as the court addresses the

17  recreational impacts as an alternative ground under the

18  counterfactual assumption that the impacts finding was proper, the

19  court cannot reject TRPA's attainment conclusion.  The record

20  demonstrates that TRPA concluded that all recreational thresholds

21  were in attainment and that the trend for these thresholds was

22  _____

23  [7] The court further notes that this resolution did not set a
    target date for at least one of the thresholds at issue, Dkt. No.

24  113 at page 33 of 50, ("[t]here is no basis for prediction of a
    [phytoplankton water quality threshold] attainment date, if

25  attainment is possible."), and that this resolution appears to
    conflict in some ways with the concurrently-issued 2006 Threshold

26  Evaluation, compare id. at 12 of 50 with AR 11:7207 (whether the
    trend for carbon monoxide levels is positive).

1  positive.  AR 11:7207.  This conclusion was not inconspicuous,
2  although this predicate determination should have been more clearly
3  referenced in the findings adopting the Amendments. Where the
4  threshold has already been attained and is not suffering a downward
5  trend, a finding that the amended ordinances will implement the
6  plan so as to preserve the status quo is all that Code § 6.5
7  requires.

8      Accordingly, TRPA arbitrarily and capriciously concluded that
9  the "the Regional Plan and all of its elements, as implemented
10 through the Code, Rules and other TRPA plans and programs, as
11 amended, achieves and maintains" the thresholds for carbon
12 monoxide, ozone, particulates, atmospheric nutrients; winter
13 clarity, phytoplankton, single event noise, community noise,
14 recreation and scenery.  Code § 6.5.  As to recreation, this
15 holding is predicated on the court's conclusion that TPRA failed
16 to demonstrate that the Amendments would not significantly
17 adversely affect recreation on the lake.

18 **B.   The Obligation to Mitigate Adverse Impacts to a Less Than**
19     **Significant Level**

20     The Amendments were a "project" for which the Compact required
21 TRPA to prepare an "environmental impact statement" ("EIS").
22 Compact art. I(h), VII(a)(2).  Pursuant to the EIS requirement,
23 TRPA could not approve the Amendments unless TRPA had "required"
24 or "incorporated" measures "which avoid or reduce the significant
25 adverse environmental effects to a less than significant level" or
26 ////

1  TPRA found such measures to be infeasible.[8]   Compact art.

2  VII(d)(1). There was no finding of infeasibility here.

3       Plaintiffs contend that for a variety of reasons, TRPA's

4  conclusion that there would be no significant impacts was arbitrary

5  and capricious.   The court concludes that TRPA failed to support

6  its conclusions with regard to air, water, recreation, and noise,

7  but the court rejects plaintiffs' challenge to the determination

8  that the Amendments would not significantly adversely affect scenic

9  values.

10      **1.   Challenge to the Baseline**

11      The EIS serves to identify "[t]he significant environmental

12  impacts *of the proposed project*," i.e., the impacts of what the

13  agency proposes to *do*.   Compact art. VII(a)(2)(A).   Under the

14  Amendments, TRPA proposes to, among other things, issue permits for

15  buoys in excess of those presently on the lake.   TRPA separately

16  plans to identify the illegal buoys presently on the lake and

17  either issue permits for those buoys or to remove them while

18  authorizing others buoys to replace them.   Plaintiffs argue that

19  the EIS masked the impacts of permitting or replacing unauthorized

20  buoys by including the existence of those buoys in the

21  environmental baseline even though TRPA's plan regarding existing

22  illegal buoys is an aspect of the proposed project.   The court

23

24       [8] The version of the Compact ratified by the states includes
    the word "than," although the version ratified by Congress does
25  not.   As explained in the court's September 18, 2009 order issuing
    a preliminary injunction, the court interprets the compact as
26  written above.

1  agrees.

2          a.   **The EIS's Baseline and Treatment of Unauthorized**

3               **Buoys**

4       In discussing buoys, the EIS begins with the estimate that

5  4,454 buoys exist on the lake.  AR 2:746.  An unspecified number

6  of these buoys have not been permitted by TRPA.   Id.   The

7  Amendments approach these buoys as follows:

8                   TRPA would first recognize all buoys
                    previously permitted by TRPA.  Then, those
9                   buoys that have been permitted by other
                    agencies with appropriate jurisdiction that
10                  meet the TRPA location criteria would be
                    permitted.   At this point, all other
11                  unpermitted buoys on the lake would be
                    removed, unless the owners can clearly
12                  demonstrate their buoys' existence in the Lake
                    prior to 1972.  New buoy applications would
13                  then be accepted from those littoral owners
                    who did not previously place unpermitted buoys
14                  in the lake.  No more than 4,454 buoys will be
                    allowed in the lake, until TRPA successfully
15                  implements the Blue Boating Program.

16  Id.  Although this plan contemplates identification of which buoys

17  are unpermitted (and thus the number of such buoys) the EIS does

18  not do so.  Nor has TRPA explained why such identification will be

19  possible in the future but is not in the present.

20      The "baseline" adopted by the EIS includes the existence of

21  all 4,454 existing buoys.   See, e.g., AR 2:773-74.[9]   Plaintiffs

22  ─────────────

23          [9] The EIS explains that it used 2002 in setting the baseline
    of 4,454 existing buoys.  AR 2:746. It is unclear which year TRPA
24  used for the baseline for other facilities.  For example, in
    discussing boat emissions in the Oct. 2008 Addendum to the EIS,
    TRPA inconsistently refers to 2002 and 2004 as representing the
25  baseline.  Compare AR 2:773 with AR 2:774.  No party has explained
    this difference or argued that it demonstrates any separate
26  impropriety.

1  argue that by incorporating existing unpermitted buoys into the

2  baseline, TRPA proposes to authorize buoys while disregarding the

3  effects of doing so.  The EIS calculates the effects of the

4  Amendments by comparing the baseline conditions with the conditions

5  that will result from construction of all structures potentially

6  permitted by the Amendments.  AR 2:773-74.  This calculation is

7  used to determine the impacts that must be mitigated.  Id.  Thus,

8  while TRPA will issue permits for presently unpermitted buoys or

9  their replacements under the Amendments, the newly-permitted buoys'

10 effects are excluded from the amounts to be mitigated by the Blue

11 Boating and Adaptive Management Programs.

12     Separate from this baseline, the EIS describes a "no-action"

13 alternative under which TRPA would permit the maximum number of

14 buoys available under the prior version of the ordinances (i.e.,

15 under the prohibition on development in prime fish habitat).  AR

16 2:680 (2008 EIS).  At least some CEQA cases have endorsed the

17 practice of describing both existing conditions and likely future

18 conditions under existing policy.  See, e.g., Woodward Park

19 Homeowners Ass'n, Inc. v. City of Fresno, 150 Cal. App. 4th 683,

20 714 (2007).  Here, under the EIS's no-action alternative the number

21 of buoys on the lake would rise to 5,826.  AR 3:1889.  The EIS

22 appears not to have used this no-action alternative in assessing

23 the effects of the Amendments.  The parties have not directly

24 addressed the propriety of this no-action alternative or the

25 distinction drawn between it and the baseline.

26 ////

1          **b.   Whether the Baseline Was Appropriate**

2          The court is not aware of any other case addressing a

3    challenge to the baseline used in an EIS prepared under the

4    Compact.  In arguing over the propriety of the baseline here, the

5    parties cite a range of cases, primarily interpreting CEQA and

6    NEPA.  To the extent that these cases apply here, they support the

7    conclusion that approval of unauthorized buoys or their

8    replacements is an aspect of the agency action and that inclusion

9    of existing unauthorized buoys in the baseline impermissibly

10   obscured this action's effects.[10]

11         Before turning to the cases, the court notes two governing

12   principles of statutory interpretation.  First, cases interpreting

13   other statutes inform interpretation of the Compact only where

14   those cases rest on language analogous to that used in the Compact.

15   Glenbrook Homeowners Ass'n v. TRPA, 425 F.3d 611, 615-16 (9th Cir.

16   2005) (citing Yates v. United States, 354 U.S. 298, 309 (1957))

17   (explaining that NEPA regulations do not apply to the Compact).

18   Second, statutes must be interpreted in light of their context.

19   Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S.

20   644, ___, 127 S.Ct. 2518, 2534 (2007).  This context includes both

21   the overall statutory scheme, id., as well as the statute's

22   ───────────────

23         [10] The statutes themselves are inapplicable.  TRPA is not a
     federal agency and therefore not subject to NEPA.  Glenbrook
     Homeowners Ass'n v. TRPA, 425 F.3d 611, 615 (9th Cir. 2005).

24   Although plaintiffs' complaint alleged that CEQA directly applies
     to TRPA's actions in California, in the present motions plaintiffs

25   do not assert this theory of liability.  See Compl. ¶ 70 (citing
     California Dep't of Transp. v. City of South Lake Tahoe, 466 F.

26   Supp. 527, 537 (E.D. Cal. 1978)).

1  purpose, see, e.g., <u>Babbitt v. Sweet Home Chapter of Cmtys. for a</u>
2  <u>Great Or.</u>, 515 U.S. 687, 699 (1995), <u>Cmtys. for a Better Env't v.</u>
3  <u>City of Richmond</u>, 184 Cal. App. 4th 70, 89 (2010) (citing <u>Cmtys.</u>
4  <u>for a Better Env't v. S. Coast Air Quality Mgmt. Dist.</u>, 48 Cal. 4th
5  310, 328 (2010)).[11]  With these principles in mind, the court turns
6  to the cases cited by the parties.

7       The Compact requires that the EIS identify the effects of the
8  action.   A "practical requirement" of this type of review is
9  identification of "baseline conditions . . . against which to
10 compare predictions of the effects of the proposed action."  <u>Am.</u>
11 <u>Rivers v. Fed. Energy Reg. Comm'n</u>, 201 F.3d 1186, 1195 n.15 (9th
12 Cir. 1999) (quotation omitted).  CEQA also requires that action be
13 measured against a baseline, also referred to as the "environmental
14 setting."  <u>Cmtys. for a Better Env't</u>, 48 Cal. 4th at 320.

15      Many CEQA cases have held that where the existing legal
16 framework (whether a license, plan, <u>etc.</u>) would permit development
17 or activity in excess of actual physical conditions, physical
18 conditions must be used as the baseline.  First in this line of
19 cases is <u>Environmental Planning & Information Council v. County of</u>
20 <u>El Dorado</u>, 131 Cal. App. 3d 350, 358 (1982).  In <u>El Dorado</u>, the
21 proposed project would have authorized development at a level
22 greatly in excess of that then existing but below the amount
23 authorized by the prior general plan.  <u>Id.</u>  The county used the

24

25      [11] The court uses "<u>Communities for a Better Environment</u>" to
   refer to the California Supreme Court's decision at 48 Cal. 4th
26 310, rather than the California Court of Appeal's decision at  184
   Cal. App. 4th 70.

1  general plan as the baseline, giving the impression that the plan
2  would reduce development.  <u>Id.</u>  In deciding whether this was
3  permissible, the court noted that the purpose of environmental
4  review under CEQA was "to provide public agencies and the public
5  in general with detailed information about the effect which a
6  proposed project is likely to have on the environment" and, more
7  generally, "to afford the fullest possible protection to the
8  environment within the reasonable scope of the statutory language."
9  <u>Id.</u> at 354-55.  From this perspective, the court rejected use of
10 the prior plan as the baseline, as this could "only mislead the
11 public as to the reality of the impacts and subvert full
12 consideration of the actual environmental impacts that would
13 result."  <u>Id.</u> at 358.  <u>El Dorado</u> was later used as the basis for
14 a CEQA guideline, which provides that the baseline will "normally"
15 be "the physical environmental conditions . . . as they exist . .
16 . at the time environmental analysis is commenced."  CAL. CODE REGS.,
17 tit. 14, § 15125(a).  The California Supreme Court recently
18 affirmed this line of cases and their use of this guideline in
19 <u>Communities for a Better Environment</u>.  There, a refinery had
20 licenses to operate four boilers, each specifying a maximum
21 operating level.  48 Cal. 4th at 322.  Although these licenses in
22 principle authorized all four boilers to simultaneously operate at
23 maximum capacity, this never occurred in practice.  <u>Id.</u>  Instead,
24 no boiler operated at the maximum level unless one or more other
25 boilers had been shut down for maintenance.  <u>Id.</u>  The Court
26 overturned an EIR that used the legally authorized but never

1  realized limit, rather than actual practice, as the environmental
2  baseline.  "An approach using hypothetical allowable conditions as
3  the baseline results in 'illusory' comparisons that 'can only
4  mislead the public as to the reality of the impacts and subvert
5  full consideration of the actual environmental impacts,' a result
6  at direct odds with CEQA's intent."  Id. (quoting El Dorado, 131
7  Cal. App. 3d at 358). (1983)).

8      Communities for a Better Environment recognized that three
9  California cases have allowed this sword to cut the other way.  Id.
10  at 321 n.7 (citing Eureka Citizens for Responsible Gov't v. City
11  of Eureka, 147 Cal. App. 4th 357 (2007), Fat v. County of
12  Sacramento, 97 Cal. App. 4th 1270 (2002), Riverwatch v. County of
13  San Diego, 76 Cal. App. 4th 1428 (1999)).  As characterized by the
14  Court, the Courts of Appeal in these cases had held that physical
15  conditions would "ordinarily" serve as the baseline even "where
16  actual development or activity had, by the time CEQA analysis was
17  begun, already exceeded that allowed under existing regulations."
18  Id. at 321.  As explained above, the issue in Communities for a
19  Better Environment was the converse scenario, which implicated
20  separate concerns.  The Court's analysis merely recognized these
21  opinions in passing without endorsing them.

22      In this case, TRPA primarily relies on Fat.  In Fat, an
23  airport had operated without permits for decades.  In reviewing a
24  permit for an expansion, the county used the airport's existing but
25  unauthorized condition as the baseline.  Id. at 1278.  The court
26  upheld this baseline, resting primarily on the ground that it

26

1  complied with the guideline.  Id. at 1280-81.  Insofar as Fat
2  simply rested on the text of the guideline, Fat carries little
3  weight here.

4      What Fat did not discuss was the fact that sub silentio
5  approval of existing unauthorized activity is in an important sense
6  an agency action.  The Ninth Circuit has recognized this principle
7  under NEPA.  Friends of Yosemite Valley v. Scarlett, 439 F. Supp.
8  2d 1074, 1105 (E.D. Cal. 2006) ("Scarlett"), aff'd by Friends of
9  Yosemite Valley v. Kempthorne, 520 F.3d 1024 (9th Cir. 2008)
10 ("Friends").  In Friends, as with many NEPA cases, the baseline was
11 expressed as the "no-action" alternative.  520 F.3d at 1038 (using
12 these terms interchangeably).  The EIS was invalid because every
13 alternative it considered, including the no-action alternative,
14 assumed the existence of projects that required agency
15 authorization but that the agency had not yet validly authorized.
16 Id. at 1037-38.  The agency had previously authorized these
17 projects, but that authorization had been validated prior to
18 preparation of the EIS.  Id. at 1030.  The District Court observed
19 that by the time the EIS at issue was prepared many of these
20 projects had already been implemented and that "it would be
21 contrary to NEPA to pretend that [these projects were] not now part
22 of the status quo."  Scarlett, 439 F. Supp. 2d at 1105.
23 Nonetheless, because the projects had not been authorized and the
24 project at issue concerned, in part, whether to authorize them,
25 including these projects in the baseline wrongfully "'assume[d] the
26 existence of the very plan being proposed.'"  Friends, 520 F.3d at

27

1038 (quoting Scarlett, 439 F. Supp. 2d at 1105).

The concern in Friends is particularly relevant to the Compact.  Like CEQA and NEPA, the Compact serves to inform the public and to protect the environment in a general sense.  The Compact goes further, however, by commanding TRPA to improve environmental quality, in some instances dramatically, by setting and attaining environmental thresholds.  Removing unauthorized buoys without authorizing replacements would apparently be one way to make progress toward attainment of these thresholds.  Forfeiture of that opportunity is an action, rather than a perpetuation of the status quo.  Put differently, an agency may not escape its duty by ignoring that duty and then presenting the result as a fait accompli incorporated into an environmental baseline.  See Swan View Coalition v. Barbouletos, No. 6-73-M, 2008 WL 5682094, *16, 2008 U.S. Dist. LEXIS 56677 *45-46 (D. Mont. 2008) (taking this view with respect to an analogous baseline issue under section 7 of the Endangered Species Act, 16 U.S.C. § 1536).

This is not to say that the EIS should ignore the existing effects of unauthorized action.  Scarlett properly recognized that damage resulting from existing but unauthorized projects must be acknowledged in the EIS.  Similarly, where the Bureau of Land Management ("BLM") had allowed an illegal off-highway vehicle trail network to develop over a period of decades, a Northern District of California case held that using conditions as they existed in 1980 as the baseline, as plaintiffs there recommended, would violate NEPA's purpose of providing complete and accurate

28

1   information about the effects of agency action. <u>Ctr. for</u>
2   <u>Biological Diversity v. U.S. BLM</u>, No. C 06-4884, 2009 U.S. Dist.
3   LEXIS 90016, *92 (N.D. Cal. Sept. 28, 2009) ("<u>CBD v. BLM</u>").[12]
4   Similarly, California courts have suggested that it would be
5   problematic to exclude unauthorized activity by using conditions
6   as they existed in the past as the baseline. <u>Riverwatch</u>, 76 Cal.
7   App. 4th at 1453 (discussing "early baselines"). It appears to the
8   court, however, that a baseline may reflect damage that has already
9   occurred as a result of illegal activity as well as the agency's
10  present ability and responsibility to limit perpetuation of that
11  harm through enforcement.

12      Two remaining California decisions have upheld use of a
13  baseline reflecting existing unauthorized activity, resting on
14  concerns that are inapplicable here. In the first, <u>Riverwatch</u>,
15  plaintiffs argued that the baseline should have excluded the
16  effects of past illegal land disturbance. 76 Cal. App. 4th at 1452.
17  The court rested on the county's conclusion that requiring the
18  county to determine whether these disturbances were legal, as a
19  prerequisite to determining whether to exclude them, would
20  "interfere [with], conflict [with,] or unfairly amplify" the
21  enforcement actions already undertaken by the Army Corps of
22  Engineers, the entity with jurisdiction over the issue. <u>Id.</u> at

23
24      [12] <u>CBD v. BLM</u> held that enforcement after decades of inaction was itself an agency action, upholding BLM's use of a baseline that included continued use of at least some unauthorized roads. 2009
25  U.S. Dist. LEXIS 90016, *91-93. Although <u>CBD v. BLM</u> is a well-reasoned opinion, for the reasons stated above the court does not
26  find this particular ground for decision persuasive in this case.

1453.  The second, <u>Eureka Citizens for Responsible Gov't</u>, 147 Cal.
App. 4th 357, rested on <u>Riverwatch</u> and the language of the
guidelines to hold that even where the agency preparing the EIR is
the enforcement agency, addressing prior illegality through the EIR
process could interfere with enforcement efforts.  147 Cal. App.
4th at 370-71.  In this case, TRPA has not argued that determining
the number of unauthorized buoys at this stage would interfere with
subsequent enforcement.  Because enforcement action regarding all
unauthorized buoys is an aspect of the very project under
consideration here, such interference appears unlikely.  Nor has
TRPA argued that information necessary to identify the number of
unauthorized buoys is unavailable.  <u>C.f.</u> <u>CBD v. BLM</u>, 2009 U.S.
Dist. LEXIS 90016, *92 (explaining that records necessary to
determine which roads were illegal did not exist).

Finally, the facts of the project here are in an important way
distinct from those in any of the cited cases.  In each of the
above cases, the issue was whether the agency could let sleeping
dogs lie.  Here, TRPA proposes to act on its existing duty to
enforce permit requirements, to issue permits to only those
existing buoys that can otherwise be lawfully permitted, and to
remove the remaining buoys only to permit other unrelated buoys in
their place.

For these reasons, the court concludes that the EIS's use of
the number of existing buoys, rather than the number of existing
buoys authorized by TRPA, as the baseline, was contrary to the
////

1   Compact and therefore arbitrary and capricious.[13]

2      Because TRPA calculated the effects of the action by reference

3   to this baseline, this error infects much of the entire EIS.  For

4   example, TRPA's conclusion that the effects on air and water

5   quality would be mitigated to the point of insignificance was based

6   on an incorrect calculation of the magnitude of those effects.  Use

7   of the inappropriate baseline therefore invalidates the EIS's

8   analysis of air quality, water quality, and noise.[14] In order to

9   guide TRPA on remand, and in light of the possibility of appeal,

10  the court addresses the merits of plaintiffs' independent arguments

11  challenging the EIS.  In order to do so the court assumes, contrary

12  to the above conclusion, that the EIS used a permissible baseline.

13      **2.   TRPA's Finding that Impacts on Air and Water Quality**

14          **Would Be Less than Significant**

15      Independent of their challenge to the baseline, plaintiffs

16  argue that the EIS's discussion of mitigation is inadequate.  The

17  court summarizes the EIS's calculation of air and water quality

18  _____

19      [13] Alternatively, in light of the above concerns and TRPA's
    failure to identify any discussion in the EIS of why this baseline
20  was chosen, the baseline is arbitrary and capricious in light of
    TRPA's failure to consider an important aspect of the problem and
21  to articulate a rational connection between the facts found and
    conclusions reached.  McNair, 537 F.3d at 987, Earth Island Inst.,
22  442 F.3d at 1157.

23      [14] The baseline error does not appear to pertain to scenery or
    recreation.  The EIS concluded that additional buoys could impact
24  scenic values, but plaintiffs have neither challenged the EIS's
    conclusion that these impacts would be mitigated nor asserted that
25  the baseline error implicates the scenery analysis.  Because the
    recreation analysis did not discuss buoys in any detail, the
26  baseline error with respect to buoys is not itself a ground for
    rejecting the recreation analysis.

impacts and the adopted mitigation thereof. The court then addresses the sufficiency of this mitigation from the NEPA perspective. Although the NEPA caselaw generally corresponds with the CEQA standards, the court separately addresses TRPA's contention that under CEQA, an agency may offer a commitment to achieving specific performance standards in lieu of other discussion of mitigation. The court concludes that TRPA has misinterpreted the CEQA caselaw and that the EIS is inadequate whether viewed from the CEQA or NEPA perspective. Accordingly, the court does not address whether the Compact's EIS provision, when interpreted in light of the Compact's extensive substantive requirements, imposes requirements beyond those imposed by CEQA or NEPA with respect to this issue.

### a.   Potential Impacts on Air and Water Quality

The EIS asserts that construction of boating facilities authorized by the Amendments will induce additional motorized boating and that emissions from this boating will, if unmitigated, adversely affect air and water quality.[15]

The EIS provides numeric estimates of these impacts. In deriving these estimates, the EIS first estimates that once the maximum number of facilities permitted by the Amendments is constructed there will be 294,895 motorized "boat trips" each year,

---

[15] The EIS acknowledges that other aspects of the Shorezone Amendments, such as dredging and effects of development in the backshore, will also impact air and water quality. AR 2:774, 779. Plaintiffs' present motion does not challenge the EIS with regard to these impacts or mitigation thereof.

1    an increase of approximately 62,686 annual trips over the baseline.

2    AR 2:774.  The EIS acknowledges that the rate at which these trips

3    are added will not be uniform, but explains that averaged over the

4    time it will take for new facilities to be constructed, every year

5    there will be 2,850 more boat trips than there were in the year

6    prior.  Id.  Absent mitigation, these 62,686 additional boat trips

7    will impair water quality by annually depositing into the lake an

8    additional 177 tons of hydrocarbons, 318 tons of nitrous oxides,

9    0.046 tons of polycyclic aromatic hydrocarbons, and 7.8 tons of

10   particulate matter.  AR 2:774.  These trips will similarly impact

11   air quality by annually emitting into the atmosphere an additional

12   17 tons of nitrous oxides, 51 tons of reactive organic gasses, 4

13   tons of particulate matter, and 400 tons of carbon monoxide.  AR

14   7:789.[16]   Plaintiffs do not challenge the propriety of these

15   estimates.  Pls.' Statement of Undisputed Facts ("SUF") ¶ 25.

16        The EIS asserts that even if no further boating facilities

17   were approved the number of annual motorized boat trips would

18   nonetheless increase.  AR 2:774, 788.  This "background" growth is

19   included in the estimates above.  AR 2:774.  TRPA now argues that

20   because this background growth is not attributable to the effects

21   of the project, the above figures do not represent the project's

22   impacts.  TRPA'S Response to Pls.' SUF, ¶¶ 25c, 25e.  The court

23   disregards this argument as contrary to the EIS's stated position.

24   The EIS acknowledged this issue, incorporated this background

25   _____

26        [16] Some pollutants appear on both lists because boats emit
     these pollutants directly into both the air and water.  AR 7:787.

                                    33

1   growth into the numeric values anyway, and explicitly stated that

2   those values represented the impacts that the project was required

3   to address, avoid, or mitigate.  AR 2:773-74.[17]  The EIS expresses

4   this requirement by stating that for each year, TRPA must avoid or

5   mitigate the emissions resulting from that year's expected increase

6   in boating.  Id.

7             **b.    Proposed Measures to Avoid and Reduce Air and Water**

8                  **Quality Impacts**

9        The EIS concludes that the above impacts of motorized boating

10  will be mitigated by the Blue Boating Program and by increased

11  enforcement--funded by buoy fees--of existing "no wake" zones and

12  a 7 mph boating speed limit in the Emerald Bay region of the lake.

13  AR 2:775-77, 788-91, see also Code §§ 54.13.2, 54.14.  These

14  programs will be implemented and refined pursuant to the Shorezone

15  Adaptive Management Program.  Code § 54.16.

16       TRPA primarily relies on the Blue Boating Program, which the

17  Amendments establish under Code § 54.15.  TRPA summarizes this

18  program as involving four elements pertinent to air and water

19  quality, which invoke a mixture of regulatory tools.  First, the

20  Blue Boating Program will impose substantive requirements on engine

21  tuning, bilge water, and sewage management.  Code §§ 54.15.A(2),

22  (4)-(5).  The Amendments call for the creation of "programs" that

23  will impose these requirements but do not describe the requirements

24

25       [17]  Alternatively,  if  the  court  were  to  accept  TRPA's
     litigation position and conclude that the figures did not state the
26   effects  of  the  action,  the  EIS  would  be  invalid  for  failing  to
     provide  a  statement  of  those  effects.

1  themselves.    Second,  the  Blue  Boating  Program  calls  for  a

2  "mitigation  fee  program"  to  be  used  to  "implement  additional

3  pollution control measures."  Code § 54.15.A(7).  The third element

4  is a "boat certification program," which will implement the first

5  two elements.  The certification program will "requir[e] operators

6  of  motorized  watercraft  .  .  .  to  certify  compliance  with  Blue

7  Boating  Program  requirements  through  a  registration  and  sticker

8  program."  Code § 54.15.A(1).  Operators will be required to

9  purchase these stickers, with the fee for any boat's sticker to be

10 calculated under "an engine rating system designed to promote use

11 of  cleaner  engines."  Id.  Thus,  the  sticker  program  provides  an

12 incentive for boaters to limit their impacts and also provides fees

13 for  other  mitigation  programs.    Fourth  and  finally,  the  Blue

14 Boating Program calls for water quality monitoring, education, and

15 enforcement  programs  that  will  implement  the  above.    Code §§

16 54.14.A(6), (8)-(9).

17     The  EIS  and  other  documents  included  in  the  administrative

18 record provide few additional details regarding the Blue Boating

19 Program.  A "Blue Boating Fact Sheet" incorporated in the EIS

20 proposes a preliminary schedule of sticker fees based on engine

21 horsepower  and  estimates  that  the  sticker  fees  will  initially

22 generate $570,000 annually, of which an estimated $400,000 will be

23 available for mitigation efforts.  AR 2:829, 831.  TRPA has not

24 identified  any  discussion  in  the  record,  however,  of  particular

25 potential mitigation efforts.  The engine tuning requirement will

26 require  that  engines  be  tuned  to  reduce  emissions  as  appropriate

1  to the lake's elevation without explaining what this involves.  AR

2  2:830.  The sewage management program will involve prohibiting

3  sewage discharge, informing boaters of this prohibition, and

4  providing free alternative sewage disposal at marinas.  <u>Id.</u>  The

5  clean bilge program will impose unspecified bilge water

6  requirements and provide boaters with sponges to absorb

7  contaminants.  <u>Id.</u>

8       The Amendments and EIS acknowledge that the Blue Boating

9  Program is incomplete, and the Amendments provide a schedule for

10 implementation.  TRPA's executive director must present a plan for

11 implementation of the Blue Boating Program by March 2009 and TRPA's

12 governing board ("Board") must adopt an implementation plan by

13 March 31, 2010.  Code § 54.15.B(1).  If the Board does not adopt

14 a plan on that date, TRPA may not "accept for processing any new

15 application for an additional pier, boat lift, buoy, boat slip, or

16 boat ramp, or for the expansion of an existing pier."  Code §

17 54.15.B(3).  All motorized watercraft are prohibited from operating

18 on the lake after May 1, 2010, unless the boat has obtained a

19 sticker under the Blue Boating Program.  Code § 54.15.B(2).[18]

20 Finally, TRPA is prohibited from issuing permits for buoys beyond

21 the 4,454 included in the baseline until the Blue Boating Program

22 is in place.  Code § 54.4.F(1).  Separate from the schedule

23 provided in the Amendments themselves, the EIS explains that the

24

25       [18] For the reasons stated in note 1, supra, the court does not
   address whether implementation has in fact proceeded according to
26 this schedule.

36

first step in the implementation of the Blue Boating Program will be to inventory all boats entering the lake and that completion of the Blue Boating Program will be integrated into the process for calculating the Total Maximum Daily Loads for pollutants under the Clean Water Act.   AR 2:828-31.

Separate from the Blue Boating Program, the EIS states that air and water quality emissions from motorized boating will be reduced using the $175 annual fee levied on each buoy.  AR 3:1950. The final EIS stated that half of these fees will fund watercraft and buoy compliance and monitoring, thirty percent will fund water quality monitoring, and the remaining twenty percent will go to "Shoreland scenic improvement projects on public lands." AR 2:867-68, c.f. AR 3:1950.  One component of the watercraft compliance will be increased enforcement of existing "no wake" zones and a low speed limit in the Emerald Bay portion of the lake. AR 2:756.  The EIS explained that this would lessen impacts because emissions are decreased when boats operate at lower speeds.  AR 3:1956, 6:3656.

Finally, all mitigation programs are subject to review and revision pursuant to the Shorezone Adaptive Management Program. Code § 54.16.  The core of this program is the requirement that TRPA annually consider the prior year's activity and the effectiveness of mitigation in that year.  Code § 54.16.B, TRPA's Brief at 8.   This includes monitoring whether projects were implemented as permitted, whether actions have had their predicted effects, and whether any larger trends are occurring.  AR 2:882. If the "impacts of the new shorezone projects and any attendant

increases in motorized watercraft traffic" have not been mitigated, TRPA's executive director must recommend that TRPA's governing board take supplemental measures to ensure full mitigation, including but not limited to:

> (1) A moratorium on further approval of shorezone projects.
>
> (2) Modification of the criteria for approval of shorezone projects.
>
> (3) A limitation on boat launches at peak times or other restrictions on motorized watercraft traffic.
>
> (4) A prohibition of lower-rated watercraft engines.

Code § 54.16.C.  Separately, beginning March 31, 2012, if the annual report determines that the "performance measures identified in the [EIS]" have not been attained then a moratorium on approvals of boating facilities will automatically be imposed, unless the failure to achieve the performance measure "is not attributable to the approval of new shorezone projects, and all environmental impacts of those projects have been fully mitigated."  Code § 54.16.D.[19]

The Shorezone Property Owners argue that aspects of the Amendments not directly related to boating provide still further

---

[19] Section 54.16.C refers to whether the effects have been fully mitigated, whereas § 54.16.D refers specifically to "performance measures."  It appears that the performance measures include surrogates for environmental harm that is difficult to measure directly.  AR 3:1835-41, 7:4215-16.  No party has briefed the relationship between sections C and D, but the details of this relationship do not appear pertinent to this case.

mitigation of the impacts of boating facilities and motorized boating. For example, the Shorezone Property Owners point to regulations imposed on shorezone properties aimed at eliminating preventable runoff within the shorezone in order to improve the lake's water clarity. See Code § 54.4.C (requiring implementation of Best Management Practices), § 52.2.2(e) (a property is eligible for a new pier only if it has complied with said practices). The EIS did not, however, refer to any of these programs or their benefits as potentially offsetting the effects of boating and boating facilities. "[A]n agency's action must be upheld, if at all, on the basis articulated by the agency itself." Motor Vehicle Mfrs. Ass'n, 463 U.S. at 50. Because TRPA did not identify these additional measures as pertinent to the question of whether increased boating would have adverse environmental impacts, the court does not decide whether TRPA could have adopted the Shorezone Property Owners' approach.

> **c.  Whether TRPA's Finding of No Significant Impacts on Air and Water Quality Was Arbitrary or Capricious**

The EIS concluded that the above mitigation measures satisfied the Compact's requirement that "the significant adverse environmental effects" on increased boating on air and water quality be reduced "to a less than significant level." Compact art. VII(d)(1). In closely related arguments, plaintiffs argue that the mitigation measures are so indefinite that it was arbitrary and capricious to conclude that the measures would have this effect and that the EIS improperly relies on mitigation

1   measures that will be imposed after the harm has occurred.

2        The parties cite an extensive range of NEPA and CEQA cases

3   regarding requirements for discussion of mitigation under those

4   statutes.   After reviewing these lines of authority, the court

5   concludes that their requirements are equivalent for purposes of

6   the dispute here.  Because TRPA did not conclude that mitigation

7   was infeasible, the Compact required "written findings" that

8   "changes or alterations" will "avoid or reduce" environmental harm

9   to insignificance, and these findings "must be supported by

10  substantial evidence."  Compact art. VII(d)(1).  This obligation

11  requires, at a minimum, a "reasonably complete" discussion of

12  mitigation measures including "analytical data" regarding whether

13  the available measures would achieve the required result.

14  Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 352

15  (1989), Sierra Club v. Bosworth, 510 F.3d 1016, 1029 (9th Cir.

16  2007).  TRPA failed to provide such a discussion here.

17              i.  **NEPA's Requirements for Discussion of**

18                  **Mitigation**

19        Unlike the Compact, NEPA does not compel avoidance of

20  environmental harm.  Nonetheless, discussion of mitigation occurs

21  in two NEPA contexts. Most prominently, an EIS prepared under NEPA

22  must discuss possibilities for mitigation. Methow Valley, 490 U.S.

23  at 352.  Methow Valley found this obligation to be inherent in 42

24  U.S.C. § 4332(2)(C)(ii), which requires a detailed statement of

25  "any adverse environmental effects which cannot be avoided should

26  the proposal be implemented."   The Compact uses essentially

40

identical language in Article VII(a)(2)(B).  Separately, an agency
may discuss mitigation as part of a "Finding of No Significant
Impact" ("FONSI").  An agency may prepare a FONSI in lieu of an EIS
where proposed action will not have significant effects on the
environment.  See Bosworth, 510 F.3d at 1018; 40 C.F.R. § 1508.9.
A FONSI may issue where the project inherently imposes no
significant effects or where the project's effects will be
mitigated to an insignificant level.  Wetlands Action Network v.
U.S. Army Corps of Eng'rs, 222 F.3d 1105, 1121 (9th Cir. 2000);
Friends of Payette v. Horseshoe Bend Hydroelectric Co., 988 F.2d
989, 993 (9th Cir. 1993).

As a threshold issue, although the parties suggest that the
EIS and FONSI lines of cases impose differing standards on
mitigation discussions, it is not clear that this is so.  For
example, Methow Valley articulated the requirements for discussion
of mitigation in an EIS.  490 U.S. at 352.  In Wetlands Action
Network, the court held that mitigation measures adopted in support
of a FONSI were sufficient, resting this conclusion in part on the
fact that the mitigation plan satisfied Methow Valley.  222 F.3d
at 1121-22.  The parties here have not identified any clear
distinction between the standards imposed in these two contexts.[20]

Under NEPA, discussion of mitigation must be "reasonably

---

[20] If, contrary to this court's understanding, the EIS and
FONSI cases diverge, it is the latter that have greater relevance
to the Compact.  Issuance of a mitigated FONSI, like the Compact,
requires not only that mitigation be discussed but also that
mitigation be sufficient to reduce impacts to insignificance.

1   complete" and detailed enough to "ensure that environmental
2   consequences have been fairly evaluated." Methow Valley, 490 U.S.
3   at 352.   Even in the FONSI context, where the agency not only
4   describes but implements mitigation, "the agency is not required
5   to develop a complete mitigation plan detailing the 'precise nature
6   of the mitigation measures,' [although] the proposed mitigation
7   measures must be 'developed to a reasonable degree.'" Nat'l Parks
8   & Conservation Ass'n v. Babbitt, 241 F.3d 722, 734 (9th Cir. 2001)
9   (quoting Wetlands Action Network, 222 F.3d at 1121), abrogated on
10  other grounds by Monsanto Co. v. Geertson Seed Farms, ___ U.S. ___,
11  ___ 130 S. Ct. 2743, 2757 (2010).

12       A necessary aspect of a "reasonably complete" discussion is
13  an assessment of the efficacy of the mitigation measures
14  considered.   Neighbors of Cuddy Mountain v. U.S. Forest Service,
15  137 F.3d 1372, 1381 (9th Cir. 1998).   Neighbors of Cuddy Mountain
16  held that an EIS was inadequate because, among other things, it did
17  not "provide[] an estimate of how effective the [discussed]
18  mitigation measures would be if adopted, or give[] a reasoned
19  explanation as to why such an estimate is not possible." Id.   The
20  Ninth Circuit has repeatedly held that NEPA requires "analytical
21  data" describing mitigation's effectiveness.   Bosworth, 510 F.3d
22  at 1029,  League of Wilderness Defenders/Blue Mts. Biodiversity
23  Project v. Forsgren, 309 F.3d 1181, 1192 (9th Cir. 2002), Babbitt,
24  241 F.3d at 734, Idaho Sporting Cong. v. Thomas, 137 F.3d 1146,
25  1151 (9th Cir. 1998).   "A perfunctory description or mere listing
26  of mitigation measures, without supporting analytical data," is

1    inadequate.    <u>Babbitt</u>,  241  F.3d  at  734  (internal  quotations
2    omitted).

3         Even where the precise contours of the proposed action had not
4    yet been determined, EIS's upheld by the Ninth Circuit discussed
5    the effectiveness of particular mitigation measures.  <u>N. Alaska</u>
6    <u>Envtl. Ctr. v. Kempthorne</u>,  457  F.3d  969  979  (9th  Cir.  2006)
7    concerned lease of federal lands for oil exploration and drilling.
8    Because  the  precise  location  of  drilling  could  not  yet  be
9    determined,  the  EIS's  discussion  of  mitigation  was  necessarily
10   general rather than site-specific.  <u>Id.</u> at 973, 979.  Nonetheless,
11   BLM's  mitigation  analysis  discussed  a  range  of  mitigating
12   requirements, procedures, practices and design features that could
13   be  incorporated  into  the  leases,  including  a  discussion  of  the
14   effectiveness of each of these options.  <u>Id.</u> at 979.  <u>Okanogan</u>
15   <u>Highlands Alliance v. Williams</u>,  236  F.3d  468  (9th  Cir.  2000)
16   concerned a proposed mine whose precise water quality impacts were
17   uncertain.   The  EIS's  "mitigating  measures  [were]  described  in
18   general  terms  and  rel[ied]  on  general  processes,  not  on  specific
19   substantive  requirements."    <u>Id.</u> at  477.    The  EIS  nonetheless
20   included an extensive discussion of specific measures that could
21   be used to mitigate each potential impact, <u>id.</u> at 474-75, including
22   an evaluation of the probable effectiveness of each measure, <u>id.</u>
23   at 474, 477.

24        Here,  the  EIS's  discussion  of  mitigation  violates  this
25   standard.  Beginning with the Blue Boating Program, TRPA has not
26   directed the court to any discussion of the potential efficacy of

43

1  any of the program's elements, much less any "analytical data" on

2  this issue.   Even more glaring, although TRPA represents that a

3  significant aspect of the Blue Boating Program will be the use of

4  sticker fees to fund further mitigation measures, the EIS is silent

5  as to how this money might be spent.[21]   TRPA cannot blindly assume

6  that money will solve its problems.   There is no discussion of the

7  types of projects that could be funded, of the benefits such

8  projects might provide, or of whether the funding projected to be

9  available under the sticker program will be sufficient to fund the

10  needed mitigation.

11       The buoy fee program, unlike the sticker fee program, at least

12  includes some discussion of how fees may be spent.   A portion of

13  fees will be used to fund watercraft enforcement, including speed

14  limits in Emerald Bay and the no-wake zone.   The EIS contains some

15  analytic data regarding the amount by which an individual boat's

16  emissions are reduced when the boat operates at a reduced speed.

17  AR 3:1956, 6:3656.   The mere inclusion of some quantitative data,

18  however, does not render the discussion of mitigation measures

19  sufficient.   The EIS does not discuss the ultimate issue, the

20  amount by which aggregate emissions could be reduced by increased

21  enforcement.   It appears that any such discussion would require

22  some mention of what fraction of boating occurs in the areas

23

24

25       [21] The most detailed statement cited by TRPA is that sticker
    fees might fund "strategies . . . includ[ing] particulate matter
26  as well as aquatic invasive species."   AR 2:830-31.

1  subject to these limits[22] and the number of boats presently

2  operating in violation of these limits, issues on which the EIS is

3  silent.  Because the EIS contains no discussion of whether and how

4  the Blue Boating Program and buoy fees will suffice to offset the

5  air and water quality impacts of increased boating, the EIS failed

6  to take the "hard look" required under NEPA.  Methow Valley, 490

7  U.S. at 350.

8       The Adaptive Management Program does not fill these gaps.

9  Although the Adaptive Management Program lists various measures

10 that would presumably reduce environmental impacts, the description

11 of these measures in the Code is a "perfunctory description or mere

12 listing of mitigation measures[] without supporting analytical

13 data."  Babbitt, 241 F.3d at 734.  TRPA has not identified any

14 further discussion of these measures elsewhere in the EIS.

15      TRPA's conclusion that adaptive management is a sound policy

16 particularly suited to management of the Lake Tahoe region appears

17 well reasoned and prudent, and is entitled to deference.

18 Nonetheless, the Compact requires both that TRPA mitigate the

19 project's effects and that TRPA provide an EIS discussing the

20 measures TRPA will use to do so.  In light of these obligations,

21 TRPA must implement adaptive management by providing in the EIS a

22 proposal for mitigation that is already reasonably complete but

23 that will be subject to later adaptation.  Principles of adaptive

24

25      [22] Because the speed limit is imposed only in Emerald Bay it
   appears the speed limit and no wake zone encompass a small fraction
26 of the lake.

1  management support leaving open the possibility, recognized in the

2  NEPA caselaw, of a future change in mitigation strategy, but

3  adaptive management does not provide a justification for postponing

4  altogether the discussion of mitigation measures.   The court

5  therefore rejects TRPA's argument that the EIS complies with the

6  Compact because TRPA will "go slow" to ensure that mitigation

7  measures are developed and implemented before harm occurs. Even

8  assuming that this approach will avoid harm, it deprives the public

9  of the opportunity to meaningfully comment on mitigation measures

10  prior to the project's approval.[23]

11  ////

12

13      [23] Moreover, the court is skeptical, at least, as to whether
    the Amendments and EIS demonstrate that no harm will occur prior
14  to implementation of the Blue Boating Program.  Although "new"
    buoys (those in excess of 4,454) will not be authorized until the
15  Blue Boating Program is implemented and only five piers
    applications may be submitted annually, authorization of
16  replacement buoys and construction of ramps and boat slips is
    unthrottled.   Although the adaptive management program is
17  immediately effective, it is also reactive, imposing measures once
    the previous year's mitigation efforts have been shown to be
18  inadequate.
        TRPA argues that although the adaptive management program is
19  backward looking, the annual evaluations will allow reaction before
    impacts become significant because the each year boating emissions
20  will increase by at most by one percent.  TRPA's Reply, 9 (citing
    AR 2:774).  On the factual question, the EIS states that the
21  increase will be one percent per year on average, but acknowledges
    that the rate of increase will fluctuate.  The EIS does not address
22  whether initial construction of ramps and slips will front-load the
    increase.   On the legal question, it appears that even a one
23  percent increase may be significant in light of non-attainment of
    Compact thresholds and TRPA's acknowledgment of the limited number
24  of tools available to secure attainment.  Admittedly, where an
    agency determines in an EIS that an impact is insignificant, the
25  agency's interpretation of significance receives some deference.
    Here, however, TRPA cites to no discussion in the EIS of whether
26  a one percent increase is significant.

1            ii.   **Whether The Mitigation of Air and Water Quality**
2                  **Impacts Satisfies CEQA**

3       Like the Compact, CEQA requires that where a proposed project
4  would have significant environmental effects, the project cannot
5  be approved unless "[c]hanges or alterations have been required in,
6  or incorporated into, [the] project which mitigate or avoid the
7  significant environmental effects thereof" or the agency determines
8  that mitigation is unfeasible.  CAL. PUB. RES. CODE § 21081.   In
9  general, the obligation to describe mitigation under CEQA parallels
10 the obligation under NEPA, notwithstanding CEQA's substantive
11 requirement.  The court addresses CEQA separately solely to discuss
12 TRPA's invocation of <u>Sacramento Old City Ass'n v. City Council</u>, 229
13 Cal. App. 3d 1011, 1029 (1991) ("<u>SOCA</u>").   TRPA argues that <u>SOCA</u>
14 established that

15              [an] agency can commit itself to eventually
                devising measures that will satisfy specific
16              performance criteria articulated at the time
                of project approval.  Where future action to
17              carry a project forward is contingent on
                devising means to satisfy such criteria, the
18              agency should be able to rely on its
                commitment as evidence that significant
19              impacts will in fact be mitigated.

20 TRPA's brief at 15.   TRPA mischaracterizes <u>SOCA</u>, which does not
21 permit the delayed implementation of mitigation measures TRPA
22 proposes here.

23      TRPA's error stems from omission of the preface to the above
24 passage from <u>SOCA</u>.   The first sentence is preceded by the
25 limitation "for kinds of impacts for which mitigation is known to
26 be feasible, but where practical considerations prohibit devising

47

1  such measures early in the planning process (e.g., at the general

2  plan amendment or rezone stage) . . . ." SOCA, 229 Cal. App. 3d at

3  1029.[24]  The importance of these qualifiers is illustrated by SOCA

4  itself.    SOCA  concerned  a  CEQA  challenge  to  the  City  of

5  Sacramento's expansion of the Sacramento Convention Center.  This

6  expansion would require, at most, 2,621 additional parking spaces,

7  and the EIR stated that "overall level of parking utilization in

8  the study area should not exceed 90 percent."  Id. at 1020, 1022.

9  These were "specific performance criteria" that the City committed

10 to meeting, but the court did not rest on these facts.  Instead,

11 the  court  extensively  discussed  the  EIR's  evaluation  of  seven

12 potential  measures  to  mitigate  this  impact,  including  possible

13 methods of implementation and results achievable by at least some

14 of the measures.  Id. at 1020, see also id. at 1030 (describing the

15 EIR's  discussion  of  these  alternatives  as  "extensive").   In  light

16 of this discussion, the court rejected plaintiffs' argument that

17 the EIR was required to provide specific mitigation measures.  Id.

18 at 1026, 1030.  Because the City had shown that impacts could and

19 would be mitigated, CEQA was satisfied.

20      Subsequent cases have confirmed this reading of SOCA.  "SOCA

21 stands for the proposition that when a public agency has evaluated

22 the  potentially  significant  impacts  of  a  project  and  has

23 identified measures that will mitigate those impacts, the agency

24

25       [24] TRPA also omits the fact that the entire passage is taken
   from SOCA's quotation of a treatise, Remy et al., Guide to the Cal.
26 Environmental Quality Act 200-201 (1991 ed.).

1  does not have to commit to any particular mitigation measure in the

2  EIR, as long as it commits to mitigating the significant impacts

3  of the project." Cal. Native Plant Soc'y v. City of Rancho

4  Cordova, 172 Cal. App. 4th 603, 621 (2009) (emphasis added).

5  "[T]he sufficiency of the information contained in an EIR is

6  reviewed in light of what is reasonably feasible," and SOCA applies

7  where "devising more specific mitigation measures . . . is

8  impractical." Rio Vista Farm Bureau Ctr. v. County of Solano, 5

9  Cal. App. 4th 351, 375, 377 (1992). Both Cal. Native Plant Soc'y

10 and Rio Vista upheld EIRs under SOCA where the EIR offered a

11 mitigation plan that merely lacked site-specific details. Cal.

12 Native Plant Soc'y, 172 Cal. App. 4th at 610, 623 (EIR did not

13 specify where off-site habitat mitigation would occur), Rio Vista,

14 5 Cal. App. 4th at 366-67 (EIR did not specify site for future

15 waste management facility).

16    For the reasons stated in the prior section, the EIS does not

17 demonstrate that mitigation is feasible. SOCA allows an agency to

18 defer selection of a particular mitigation plan only when there is

19 reason to believe that at least some available plan will work.

20 TRPA also has provided no explanation as to why it would have been

21 impractical to provide the missing detail in the EIS.[25]

22 Accordingly, assuming that SOCA and its progeny apply to EISs

23

---

24    [25] Finally, the project is not fully contingent on achieving
   goals, as stated in footnote 24. Fed'n of Hillside & Canyon Ass'ns
25 v. City of Los Angeles, 83 Cal. App. 4th 1252, 1262 (2000) (SOCA
   inapplicable absent "a binding commitment to implement the
26 mitigation measures.").

1  prepared under the Compact, these cases do not alter the court's

2  conclusion that the EIS here is inadequate.

3       **3.   Mitigation of Recreational Impacts**

4       Plaintiffs separately challenge the EIS's finding that the

5  Amendments would not have significant adverse impacts on

6  recreational uses in the lake, including attainment of the

7  recreational thresholds.  The EIS acknowledged that piers can

8  interfere with recreational uses, including use by pedestrians on

9  the shore, AR 2:783, and use by boaters traveling near the shore,

10 AR 2:785.  The EIS concluded new piers authorized by the Amendments

11 would not significantly adversely affect these recreational uses

12 because (a) measures would minimize the impacts of new piers and

13 (b) remaining impacts of new piers would be mitigated through

14 removal of existing barriers to access.[26]  The court concludes that

15 TRPA failed to support this finding.  The court separately

16 concludes that TRPA was required to at least discuss the potential

17 recreational impacts of additional buoys.

18       **a.   Measures to Limit The Impacts of Individual Piers**

19      The EIS recognizes that factors such as the design and

20 location of a pier influence the degree to which the pier impedes

21 _____

22      [26] The EIS also found that the Amendments would further other
   types of recreational uses, such as motorized boating itself.  TRPA
23 has not argued, however, that the finding of no adverse impact
   rested on the conclusion that the benefits of improvements to that
24 type of access outweigh any harm to non-motorized recreational
   uses.   The court therefore does not address whether such a
25 conclusion would have been permissible.  The court's review is
   limited to TRPA's conclusion that non-motorized recreation would
26 be unimpaired.

1   recreational access.  The Amendments imposes several design and

2   siting criteria.  The Amendments generally prohibit construction

3   of piers in the forty percent of the lakeshore designated as

4   Shorezone Preservation Areas, areas in which pier construction

5   would have particularly significant recreational impacts.  AR

6   2:754.  TRPA notes that a new pier cannot be constructed within

7   fifty feet of an existing pier. AR 2:739.  The Amendments prohibit

8   storage under or alongside piers, facilitating public passage under

9   the piers.  Code § 51.2.G.

10      In addition to these substantive requirements, TRPA argues

11  that it may rely on the California State Lands Commission ("CSLC")

12  to ensure that new piers will not violate rights of public access

13  protected by California's public trust doctrine.  CSLC is charged

14  with interpreting and enforcing the California public trust. Nat'l

15  Audubon Soc'y v. Superior Ct., 33 Cal. 3d 419 (1983).  TRPA

16  contends that no new pier can be permitted in California absent

17  CSLC's separate approval, and neither plaintiffs nor CSLC have

18  disputed this contention.  See Code § 54.5.A(1)(d) (no new pier

19  will be permitted unless it reaches a bottom elevation of 6219

20  feet), CAL. PUB. RES. CODE § 6301 (stating that CSLC has exclusive

21  jurisdiction over submerged lands), § 6321 (CSLC may authorize

22  construction over submerged lands).  It follows, TRPA argues, that

23  no pier will be constructed in violation of the California public

24  trust.

25      TRPA must avoid impacting recreational access, including

26  impacts to rights granted by the California public trust.  It

appears that one method by which TRPA could have fulfilled this duty would have been to sign a memorandum of understanding delegating authority to CSLC or otherwise formalizing a relationship between the two.  In such a memorandum, TRPA could inform CSLC of TRPA's reliance, confirm that CSLC could meet TRPA's needs, and make TRPA's approval of piers contingent on CSLC approval.  TRPA did not do this.  The Amendments instead mandate non-binding consultation with CSLC:

> Prior to the approval of any project in shorezone of the State of California that may adversely affect legal public access, TRPA shall consult with California State Lands Commission to obtain the Commission's determination whether legal public access exists under California law. If TRPA does not receive timely written comment from the Commission after providing notice of the proposed project, TRPA may approve the project without comment from State Lands[.]

Code § 54.4.B(1).  Nothing compels TRPA to act in accordance with CSLC's determination, and TRPA does not represent that it will always do so.[27]  See TRPA's brief at 26 ("TRPA *may* then incorporate solutions to public access issues proposed by CSLC") (emphasis added).  It may be that, in practice, CSLC's own acts in granting or withholding leases will be such that all piers comply with California's public trust.  TRPA may not shirk its own duty, however, on the unexamined assumption that CSLC will not do the

---

[27] The narrow exception is that when TRPA approves a pier (with or without CSLC approval), the pier must "be located on the parcel to minimize impacts to the environment and legal public access as determined pursuant to Subsection 54.4.B."  Code § 54.5.A(1)(c).

1  same, instead picking up TRPA's slack.

2      Furthermore, even piers that do not violate public trust

3  rights may "adversely affect the desire of pedestrians to move

4  laterally along the beach or affect waterside nearshore lateral

5  recreation (e.g., kayaking, swimming, top-line fishing)."  TRPA's

6  brief at 27 (citing AR 2:743).  Thus, while compliance with the

7  above standards lessens a pier's impact on recreational access, the

8  EIS and Amendments acknowledge that the above measures, standing

9  alone, are insufficient to ensure that the Amendments do not

10 interfere with recreational access.  EIS 2:743, 783 ("The basis for

11 mitigation is that pier construction impairs public recreational

12 access along the lake.").  Such additional mitigation is required

13 regardless of whether CSLC will ensure that new piers do not offend

14 California's public trust.

15          **b.   Measures to Mitigate Remaining Recreational Impacts**

16      The Amendments propose to mitigate the unavoidable impacts of

17 new piers by using fees levied on new piers to remove existing

18 barriers to recreational access.  Construction of a new private

19 pier will carry a fee of $100,000, and expansion of a private pier

20 will incur a fee of $20 per square foot of additional area.  Code

21 § 54.13.A.  The EIS contains conflicting explanations as to the

22 derivation of this fee.  The final EIS first explains that:

23          The amount of the fee is based on estimation
            of the costs of providing equivalent
24          replacement value for recreation and public
            access *by* removing a pier from a developed
25          parcel and restricting development on the
            parcel with an easement.

26

53

AR 2:744 (emphasis added).  The document later states that:

> The amount of the LTPAF fee is based on a real-world estimation of the costs of providing equivalent replacement value for recreation and public access *that would result from* removing a pier from a developed parcel and restricting development on the parcel with an easement.

AR 2:784 (emphasis added).  Both explanations cite AR 6:3645, which explains that this fee represents the physical cost of removing a pier (e.g., labor, machinery and disposal) plus the cost of purchasing a 10 linear foot easement on the subject land.

The parties sharply disagree as to how this money will be spent, and thus whether the fee is adequate.  Under either party's interpretation of the program, the TRPA's finding was arbitrary and capricious.

If the LTPAF is intended to pay for the removal of existing piers, as plaintiffs argue, then the EIS fails to include a reasonable examination into whether the fee is adequate. Plaintiffs argue that there is no indication that lakefront property owners would be willing to part with a pier for the $80,000 at which TRPA values an easement.  If the LTPAF is intended to actually fund removal of piers, pier owners' willingness to sell piers for this price is "an important aspect of the problem" that TRPA was required to consider.  McNair, 537 F.3d at 987.  TRPA has not identified any such consideration in the EIS.

TRPA argues that although the LTPAF fee is calculated based on the price of removal, the fee is intended to be used to fund other activities.  The EIS, in describing the uses to which the

54

LTPAF fees will be put, states that the fund will go to "projects" with priorities for acquisition of public access, construction or modification of public access facilities, and "other projects that demonstrably improve public recreational access." AR 2:744.  Thus, TRPA explains, the LTPAF will fund improvements to access that provide a benefit equivalent to that of pier removal rather than funding actual pier removal.  While this may be a viable approach in principle, it suffers from the same deficiencies identified with regard to the Blue Boating Program and buoy mitigation fees.  TRPA has not included a "reasonably complete" discussion of what these projects might be, their efficacy, or whether the LTPAF will be able to afford them.

Lastly, for the reasons stated in part III(B)(2)(c)(i) above, inclusion of the Adaptive Management Program in the package of measures that will be used to mitigate impacts on recreation does not render the discussion of mitigation "reasonably complete."

For these reasons, TRPA's conclusion that construction of new piers authorized by the Amendments would not significantly adversely affect recreation was arbitrary and capricious.[28]

### c.   Recreational Impacts of Buoys

Plaintiffs separately argue that "the EIS failed to study the recreational access impacts of more buoys."  The EIS recognizes

---

[28] Because the court resolves the recreational impacts issue on these grounds, the court does not address CLSC's argument that TRPA's decision to adopt the Amendments was invalidated by TRPA's eleventh-hour omission of other proposed restrictions on pier construction.

that "shorezone structures" can negatively impact users of "small non-motorized watercraft," and that "buoys placed close together, particularly if located in large buoy fields that extend far into the Lake" may impair recreational fishing.   AR 7:4184-85.[29] Contrary to plaintiffs' characterization of the record, however, the EIS does not conclude that the recreational impacts of shorezone structures generally, or buoys specifically, is significant.

In arguing that a study of these effects was required, plaintiffs cite several comments submitted during the EIS process complaining about the impacts of buoy fields on kayaking.   AR 4:2562, 25:16517, 26:16681-82.   Plaintiffs argue that the "substantial controversy" regarding buoys compelled such a study, citing <u>Babbitt</u>, 241 F.3d at 731.   The cited portion of <u>Babbitt</u> concerned application of 40 C.F.R. § 1508.27, which provides that controversy regarding the magnitude of effects is an indication that those effects are significant for purposes of NEPA.   40 C.F.R. § 1508.27(b)(4).   In <u>Glenbrook Homeowners Ass'n</u>, 425 F.3d at 615-16, the Ninth Circuit rejected a claim that controversy over a project compelled TRPA to complete an EIS, explaining that such a claim rests on NEPA regulations inapplicable to the Compact.

_____

[29] The court acknowledges some ambiguity as to whether the above statement regarding "shorezone structures" implicates buoys. TRPA has represented that this section of the EIS "analyzed the impacts of buoys on recreation, including swimming and kayakers." TRPA's Reply at 14 n.20.   No other language in this section implicates both buoys and kayaking.   The court therefore understands TRPA's statement to mean that shorezone structures, for purposes of this issue, include buoys.

1      The inapplicability of 40 C.F.R. § 1508.27, however, does not
2  mean that TRPA's omission of further discussion is unreviewable.
3  The court must ask whether the EIS took a "hard look" at the
4  potential impacts. <u>Methow Valley</u>, 490 U.S. at 352. Agency action
5  is arbitrary and capricious where the agency has "entirely failed
6  to consider an important aspect of the problem." <u>McNair</u>, 537 F.3d
7  at 987. As the undersigned recently explained, an aspect of the
8  problem may be "important" for purposes of this rule even where it
9  is not "significant." <u>S. Yuba River Citizens League v. Nat'l</u>
10 <u>Marine Fisheries Serv.</u>, ___ F. Supp. 2d. ___, ___, 2010 WL
11 2720959, *18, 2010 U.S. Dist. LEXIS 67793, *62 (E.D. Cal. July 8,
12 2010) (reviewing the NMFS's silence as to certain factors in
13 discussing whether agency action would jeopardize protected species
14 in violation of the Endangered Species Act). Some issues are
15 important enough to demand a statement from the agency as to
16 whether or not they are significant. <u>Id.</u> Although no easy rule
17 separates the important from the unimportant, where TRPA itself has
18 stated that buoys impact recreation, the court is satisfied that
19 the problem is important.

20      The fact that TRPA has commented on the issue then raises the
21 question of whether the agency has taken the requisite "hard look."
22 The EIS recognized the potential problem but included no discussion
23 of its magnitude. This was not sufficient. The court does not
24 hold, on the present record, that TRPA was required to engage in
25 a full-blown EIS analysis of the impacts additional buoys would
26 have on non-motorized vehicle access, replete with additional

1  studies.  Because these impacts were an important aspect of the

2  problem, however, TRPA was required to at least state a decision

3  as to whether or not these impacts were significant.  This would

4  have enabled plaintiffs to challenge that decision and presented

5  the court with a record in which judicial review was possible.  S.

6  Yuba, ___ F. Supp. 2d. at ___, 2010 WL 2720959, *18, 2010 U.S.

7  Dist. LEXIS 67793, *62.

8       **4.  Mitigation of Scenic Impacts**

9       Plaintiffs challenge TRPA's finding that construction of new

10  piers would not have significant adverse impacts on scenery.  The

11  EIS took the requisite hard look at these impacts and included a

12  reasonably complete discussion of mitigation measures.  TRPA's

13  conclusion that piers would not adversely impact scenic values was

14  neither arbitrary nor capricious.

15          **a.  Standards for Scenery**

16       Scenery, unlike air and water quality or even recreational

17  access, is difficult to quantify.  TRPA has adopted four scenic

18  thresholds, each of which addresses different elements of scenic

19  quality in the basin.  These thresholds may be summarized as

20  encompassing:

21          (SR-1) the quality of scenic resources from
            viewpoints along major roadways in the Basin
22          and from the Lake towards shore;

23          (SR-2) the quality of specific views of scenic
            features of the Basin's natural landscape that
24          can be seen from major roadways and the Lake;

25          (SR-3) the "viewshed" from public recreation
            areas and certain bicycle trails; and

26

1                   (SR-4) the design standards and guidelines for
                  the built environment to produce built
2                   environments compatible with the natural,
                  scenic, and recreational values of the region.

3

4 Comm. for Reasonable Regulation of Lake Tahoe, 311 F. Supp. 2d at

5 979 (citing, inter alia, Resolution 82-11, Ordinance 93-14).

6      TRPA uses at least two quantitative tools in assessing scenic

7 value.  One is a "contrast rating" that derives a numeric score

8 based on the size of a building's facade, the coloration, the

9 amount of glass, the building structure, the material texture, and

10 the obstruction of the facade's perimeter.  See Shorezone Property

11 Owners' Request for Judicial Notice Ex. 2, at 144-50 (TRPA Design

12 Review Guidelines, App. H, Visual Assessment Tool for the Review

13 of Projects Located Within the Shoreland).  Under this rating,

14 higher scores present better scenic values.  Second, and more

15 simply, TRPA measures the amount of "visible mass."

16      TRPA also exercises informed judgment.  For example, TRPA has

17 determined that visibility of man-made objects is not a per se

18 detriment to scenic quality.  In discussing the scenic impacts of

19 additional buoys, TRPA concluded that the scenic impact of a boat

20 moored to a buoy "is not typically adverse because the presence of

21 watercraft is an expected component of lake views and contributes

22 to the scenic values of the lake."  AR 2:782.  TRPA concluded that

23 the sight of too many boats clustered together, however, did

24 ////

25 ////

26 ////

1  degrade scenic quality.  Id.[30]

2  **b.  Avoidance and Mitigation of Piers' Scenic Impacts**

3  The EIS found that the addition of piers to the lake increases

4  visible mass in the shorezone and thereby impacts scenic quality.

5  AR 2:780.  As with recreation, the Amendments address impacts on

6  scenery through a combination of measures designed to minimize the

7  impacts of new piers and measures designed to mitigate those

8  impacts that cannot be avoided.  The former measures are largely

9  the same as those for recreation.  Siting criteria restrict

10  construction of new piers in areas where they would have a

11  particularly dramatic impact on scenery, such as Shorezone

12  Protective Areas and "naturally dominated shoreline."  AR 2:780.

13  Siting criteria also restrict pier density.  Design criteria limit

14  pier size, construction, and coloration.  AR 2:740.

15  Despite these restrictions, new piers will still have a visual

16  impact.  The Amendments propose to mitigate these impacts by

17  requiring owners of new piers to remove visible mass and to achieve

18  certain contrast ratios.  As to visible mass, in areas in

19  attainment of the scenic thresholds, the owner must mitigate the

20  pier's visible mass at a 1:1 ratio.[31]  Code § 54.6.D(1).  In areas

21  not in scenic attainment, all visible mass must be mitigated at a

22  1:1.5 ratio.  Id.  This mitigation "must occur first in the

23

24  [30] Plaintiffs here do not challenge TRPA's finding that the buoys authorized by the Amendments would not have adverse impacts on scenery.

25

26  [31] The amended Ordinances impose slightly different, but more rigorous, standards for mitigation of visible mass of boat lifts.

shorezone of the project; once shorezone possibilities are exhausted, mitigation may occur in the project area shoreland." AR 2:740, Code § 54.6.D(2)(a).  "Mitigation may either be removal or screening of visible structure."  Code § 54.6.D(2)(d).  As to contrast, whenever a landowner constructs a pier or otherwise undertakes a "project" in the shorezone, the landowner must bring the onshore project area up to a contrast rating of 25.  Code § 54.6.C(1).  Because the landowners were previously only required to reach a contrast rating of 21, this will likely lead to improvements over existing conditions with regard to contrast.  AR 2:781.[32]

In contrast with the EIS's discussion of mitigation of air, water, and recreational impacts, the above discussion is reasonably complete.  Plaintiffs substantively disagree with TRPA's conclusion that the addition of visible mass on the lake can be mitigated by removal of visible mass on the shore.  As noted, a new pier must be accompanied by an offset of visible mass and attainment of contrast rating that TRPA found would be an improvement for most parcels.  Visible mass will also often be mitigated at a greater than 1:1 ratio.  Although the scenic character of a parcel without a pier is undoubtedly *different* than that of a parcel with a pier,

_____

[32] The EIS also states, in passing, that the LTPAF fees and buoy fees will mitigate scenic impacts.  AR 2:780, 782.  The description of the LTPAF program does not appear to refer to scenic projects, and the court has previously explained these programs' indefiniteness.  Nonetheless, mere inclusion of these measures in the discussion of mitigation of scenic impacts, without clear reliance thereon, does not doom the EIS's analysis.

1  equivalently reduced onshore visible mass, and an improved contrast

2  rating, TRPA concluded that the former was not *better*.  This

3  conclusion was based on an analysis of simulations of what these

4  changes would look like in a variety of parcels and the agency's

5  considered opinion.  AR 2:779-82, 6:3744-56.  TRPA's finding that

6  the Amendments would not significantly adversely affect scenic

7  values was neither arbitrary nor capricious.

8          **5.   Mitigation of Noise Impacts**

9          Plaintiffs' argument regarding impacts on noise follows a

10 familiar pattern.  Plaintiffs argue that new boating facilities

11 will induce additional boating, that more boats will mean more

12 noise, and that the Amendments' proposals for mitigation of this

13 impact are impermissibly vague.  The EIS acknowledges that the

14 Amendments will "increase noise levels throughout the area" by

15 inducing "increases in boating activity."  AR 2:791.  This impact

16 is purportedly mitigated by "[t]he Blue Boating Program, monitoring

17 and enforcement programs funded by annual buoy fees, and the

18 LTPAF."  Id.

19      With respect to noise, the Blue Boating Program and LTPAF

20 suffer the same problems discussed above.  In addition to the Blue

21 Boating Program elements pertaining to air and water quality, the

22 Blue Boating Program will include "[a] noise reduction program to

23 implement noise guidelines for the protection of wildlife and

24 community well-being."  Code § 54.15.A(2).  The EIS's discussion

25 of noise states that the Blue Boating Program will include

26 "standards regarding appropriate engine types, engine emissions,

1  and other boating features[] and use of appropriate engine
2  equipment with regard to noise standards."  AR 2:791.  These
3  features, equipment types, etc., are unspecified and their benefits
4  unexplained.  As to the LTPAF, the EIS asserts that this program
5  will reduce noise by funding programs which encourage non-motorized
6  boating, such as by improving recreational access.  AR 2:792.  The
7  nature of these programs is not specified, nor is there any
8  discussion of the extent to which such programs might induce would-
9  be motorized boaters to use non-motorized boats instead.

10     The discussion of increased enforcement is more definite but
11  nonetheless insufficient.  Existing rules prohibit aftermarket
12  boating devices that cause high "single event noise" and require
13  low speeds in no-wake zones and Emerald Bay, which reduces engine
14  noise.  Code § 81.2.E(2)(b)(2), AR 11:7634.  Present non-attainment
15  of the noise thresholds results, in part, from inadequate
16  enforcement of these limits.  AR 11:7631.  The Amendments will
17  provide additional funding for enforcement, derived from buoy fees
18  and possibly the Blue Boating Program.[33]  Thus, the EIS describes
19  a reasonably specific method for reducing the impacts of noise.
20  The EIS provides only a bare assertion, however, that the
21  additional enforcement reduces impacts *enough* to render them
22  insignificant.  See also part III(B)(2)(c)(i) above.

23

24     [33] Compare AR 2:791 (The Blue Boating Program and programs
    funded by the annual buoy fee would include monitoring and
25  enforcement" of speed restrictions) with AR 2:830-31 (providing no
    reference to speed limits in describing the enforcement or
26  mitigation fee aspects of the Blue Boating Program).

63

1    Accordingly, the TRPA's conclusion that the Amendments would
2    not impose significant adverse effects on noise was arbitrary and
3    capricious.

4    **C.    The Outstanding National Resource Water Standard**

5    The Clean Water Act creates a scheme of cooperative federalism
6    under which, inter alia, States are directed "to institute
7    comprehensive water quality standards establishing water quality
8    goals for all intrastate waters." PUD No. 1 v. Wash. Dep't of
9    Ecology, 511 U.S. 700, 704 (1994) (citing 33 U.S.C. §§
10   1311(b)(1)(C), 1313). These standards must incorporate an
11   "'antidegradation policy.'" Id. at 718 (quoting 33 U.S.C. §
12   1313(d)(4)(B)). "The antidegradation policy and implementation
13   methods shall, at a minimum," maintain three tiers of water
14   quality. 40 C.F.R. § 131.12(a). California has adopted an
15   antidegradation policy that is more nuanced than the minimum
16   provided by 40 C.F.R. § 131.12(a), but which also incorporates the
17   three federal tiers. Cal. State Water Resources Control Board,
18   Memorandum: Federal Antidegradation Policy, Oct. 7, 1987, at 2
19   (citing Cal. SWRCB Resolution No. 68-16, "Statement of Policy with
20   Respect to Maintaining High Quality Waters in California," and Cal.
21   SWRCB Order No. WQ 86-17).

22   California protects Lake Tahoe under the most stringent of the
23   three tiers, as an "Outstanding National Resource Water"
24   ("ONRW").[34]   This designation "prohibits any degradation of

25   _____

26   [34] The parties agree that the California SWRCB designated Lake
     Tahoe as an ONRW in 1980.

64

1   existing water quality standards with a limited exception for

2   short-term or temporary changes in quality." Nat'l Wildlife Fed'n

3   v. Browner, 127 F.3d 1126, 1127 (D.C. Cir. 1997) (citing Water

4   Quality Standards Regulation, 48 Fed. Reg. 51,400, 51,403 (1983)).

5   Article V(d) of the Compact provides that "[t]he regional plan

6   shall provide for attaining and maintaining Federal State, or local

7   air and water quality standards, whichever are strictest, in the

8   respective portions of the region for which the standards are

9   applicable." Plaintiffs argue that TRPA must therefore comply with

10  the ONRW standard, but that the Amendments will cause decreases in

11  water quality.  TRPA opposes this claim solely by arguing that the

12  Amendments will not result in degradation of water quality.

13      This claim imperfectly parallels plaintiffs' EIS claim.  For

14  example, while the Compact's EIS provision obliges TRPA provide

15  information sufficient to enable meaningful public participation,

16  the ONRW claim appears to merely challenge TRPA's conclusion that

17  the Amendments would achieve the requisite substantive result.

18  Nonetheless, the deficiencies in the record identified in part

19  III(B)(2), above, demonstrate that TRPA acted arbitrarily and

20  capriciously in adopting the Amendments in the face of the ONRW

21  designation.

22                      **IV. Conclusion**

23      For the reasons stated above, plaintiffs' motion for summary

24  judgment (Dkt. No. 87) is GRANTED and defendants' cross motion for

25

26

                            65

1  summary judgment (Dkt. No. 98) is DENIED.  Tahoe Regional Planning

2  Agency Ordinance number 2008 - 10, adopted October 22, 2008, the

3  Shorezone Amendments adopted at that time, the certification of the

4  Environmental Impact Statement, and all findings based thereon are

5  VACATED.   The matter is REMANDED to defendant Tahoe Regional

6  Planning Agency for further proceedings consistent with this order.

7  The clerk shall enter judgment and close the file.

8        IT IS SO ORDERED.

9        DATED:  September 16, 2010.

10

11

12                              LAWRENCE K. KARLTON
                                SENIOR JUDGE
13                              UNITED STATES DISTRICT COURT

14

15

16

17

18

19

20

21

22

23

24

25

26